[Crim. No. 2874.   Third Dist.   Dec. 12, 1958.]

THE PEOPLE, Respondent, v. JOHN BAUMGARTNER et al., Appellants.

Herbert C. Coblentz, and John L. Briscoe, Public Defender, for Appellants.

Edmund G. Brown, Attorney General, and G. A. Strader, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment following the verdict of a jury finding defendants guilty of robbery in the first degree, and from an order denying a new trial. The information charged that on November 18, 1957, the defendants took from the person and immediate presence of one James Hicks the sum of $2,000 by means of force and by putting the said James Hicks in fear. The scene of the robbery was the Gaines Super Market in Stockton, California. The time was about 8:45 p. m. Four market employees were present when two men entered the market. They were identified, at the trial, by a number of witnesses as being the defendants. Baumgartner had a .45 automatic in his hand, Foster a .22 caliber revolver. The employees were forced to open the cash registers and remove the money. An attempt to open the safe was futile. After securing the cash available from the registers, the men ordered the market employees to the rear of the market and fled. The identifications were positive. Four days after the commission of the robbery, Baumgartner was arrested at his home in Palo Alto. The officers found $300 in currency hidden in the mattress of his bed and a .45 caliber automatic was taken from his automobile. Foster was arrested in Los Angeles County six days after the robbery. At the time of his arrest he had a .22 caliber revolver in the glove compartment of his automobile. One Frank Gail Cox, aged 17 years, testified that he saw Foster on a street in Stockton on the afternoon of November 18, 1957; that Foster waved him down and got into his car, promising to give him $5.00 if he would take him to Palo Alto; that he drove Foster to Palo Alto and to John Baumgartner's home, being directed thereto by Foster; that Foster left the car and had a conversation with Baumgartner, then came back to the car and that

Cox and Foster went to a local restaurant for coffee; that during the conversation at the restaurant, Foster asked Cox if a certain super market in Stockton would be easy to rob; that Cox stated he didn't know, whereupon Foster said that he intended to rob it; that Foster then returned towards Stockton in Baumgartner's car while Cox followed them as far as the Dumbarton Bridge where he lost them; that at about 9 o'clock that evening he went to the Gaines Market where he found that the market had been robbed by two men, but he did not then give his information to those present. There was other evidence corroborative of the testimony of the market employees and of Cox. Both defendants took the stand and denied their guilt and both presented alibi witnesses of more than usual apparent merit. To convict, the jury must have disbelieved them. Both men had priors.

After the jury had deliberated for six hours, they were returned to the court at their request. Their foreman informed the court that they could not agree on a verdict. Thereupon the following occurred:

"THE COURT: Mr. Gerken [the Foreman]. What is it you want to tell me?

"THE FOREMAN: The jury cannot reach a decision on this matter.

"THE COURT: Mr. Foreman, I am going to ask you a question and I wish you would listen to the question very carefully before you answer it because at this time the only thing I want is the answer to the particular question—I am not asking you to name the defendant—I am only asking you this: I assume that the jury is divided numerically?

"THE FOREMAN: Yes.

"THE COURT: How do you stand numerically?

"THE FOREMAN: Eleven for conviction and——

"THE COURT: (Interposing) Just eleven——

"THE FOREMAN: Eleven to one.

"THE COURT: Eleven to one.

"You may be seated, sir.

"Ladies and Gentlemen of the Jury, I am going to ask you to deliberate further upon the matter.

. . . . . . . . . . . . . .

"THE COURT: . . . I will read you then one further instruction.

"THE FOREMAN: Yes, sir.

"THE COURT: Ladies and Gentlemen of the Jury: In a large proportion of cases, and perhaps, strictly speaking, in

all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his or her fellows, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided; that you are selected in the same manner, and from the same source from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve men and women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the People of the State of California to establish every part of it beyond a reasonable doubt; and if, in any part of it, you are left in doubt, the defendant is entitled to the benefit of the doubt, and must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women, equally honest, equally intelligent with himself or herself, and who have heard the same evidence with the same attention with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

"Now, ladies and gentlemen of the Jury, I will ask you to deliberate further upon this matter."

Forty minutes later the jury returned with a verdict of guilty as to both defendants.

█ When, as here, a jury informs a court that it has not

agreed and that there is doubt that agreement can be reached, it is proper for the court to address to them such remarks as were contained in the quoted instruction touching the advisability of endeavoring to reach a verdict and calling to their mind those considerations stated in the court's instruction admonishing them that it is their duty to reach a verdict if they can conscientiously do so. Such instructions, however, must be carefully guarded lest the jury be persuaded the court desires a certain verdict to be brought in. A good discussion of the subject is found in *People* v. *Walker*, 112 Cal. App.2d 462, 471-475 [246 P.2d 1009]. The cases appear to turn upon the presence or absence of coercion. Coercion was found and condemned in *People* v. *Kindleberger*, 100 Cal. 367 [34 P. 852], *People* v. *Conboy*, 15 Cal.App. 97 [113 P. 703], *People* v. *Carder*, 31 Cal.App. 355 [160 P. 686], *People* v. *Blackwell*, 81 Cal.App. 417 [253 P. 964], *People* v. *Talkington*, 8 Cal.App.2d 75 [47 P.2d 368], *People* v. *Walker*, 93 Cal.App. 2d 818 [209 P.2d 834], and *People* v. *Crowley*, 101 Cal.App.2d 71 [224 P.2d 748]. The absence of coercion was noticed and the instructions given approved in *People* v. *Miles*, 143 Cal. 636 [77 P. 666], *People* v. *Rhodes*, 17 Cal.App. 789 [121 P. 935], *People* v. *Piscitella*, 90 Cal.App. 528 [266 P. 349], *People* v. *Finkelstin*, 98 Cal.App.2d 545 [220 P.2d 934], *People* v. *Lammers*, 108 Cal.App.2d 279 [238 P.2d 667], and *People* v. *Walker*, 112 Cal.App.2d 462 [246 P.2d 1009]. ▮ Coercion is much more apt to exist where, as here, the court, in the presence of the whole jury, is informed that the jury stand in a certain numerical status with regard to conviction or acquittal and in this case the situation was that the court was informed in the presence of the jury that they stood 11 to 1 for conviction. This was not the fault of the court, as the court had been careful to avoid such a statement being made. Notwithstanding, the foreman of the jury made the statement and the situation, therefore, was one in which an instruction along the line of the one given could easily result in coercion. The vital question here is whether or not under the circumstances coercion might reasonably have occurred. Examining the instruction in the light of the circumstances the court said: "But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction [and as noted in this case they stood 11 to 1 for

conviction], a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women, equally honest, equally intelligent with himself or herself, and who have heard the same evidence with the same attention with an equal desire to arrive at the truth, and under the sanction of the same oath.'' These admonitions must have appeared to the holdout juror, and to the others for that matter, to have been leveled at him. There was an implication that in achieving that holdout status the recalcitrant juror had not paid proper respect to the opinions of the others, had not listened to their arguments with a disposition to be convinced, and that he ought to have done so. Under the circumstances, the 11 might well have returned to the jury room, not minded to reason further with, but to attack, the recalcitrant one. The coercive effect upon the holdout juror was not mitigated by the remarks addressed to a situation where a majority were for acquittal for no such situation existed. It should be said that the instruction was proper and apt enough had the court not been informed to the knowledge of all as to the fact that the jury stood 11 to 1 for conviction. In such situations the instruction used was worked out long ago as to form and has been frequently used.

Although error was committed in giving the admonitory instruction, the question still remains whether or not the error was reversible. In this connection it ought to be said first that there are a number of other assignments of error relied upon by appellants. We have examined them and feel that nothing of moment is presented thereby. ▇ The constitutional mandate forbids a reversal for misdirection of the jury, unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.) ▇ Before the admonitory instruction was given the jury had deliberated about six hours. After it was given they returned with the verdict of guilty in 40 minutes. While we could not say from this record that there would probably have been a verdict of not guilty had the admonitions not been given, we cannot say that there would have been in such case any verdict at all. ▇ It has been said that under the provision of the Constitution an appellate court ought to direct reversal of a conviction when unable to say whether appellant would or would not have been

convicted but for the trial court's errors. (*People* v. *Smitt-camp,* 70 Cal.App.2d 741 [161 P.2d 983] ; *People* v. *Flores,* 37 Cal.App.2d 282 [99 P.2d 326].)

For the reasons given, the judgment and the order appealed from are reversed.

Peek, J., and Schottky, J., concurred.