Eugene P. FIELDS and Joseph P. Bassett,
Appellants,

v.

STATE of Alaska, Appellee.

Nos. 1137, 1138.

Supreme Court of Alaska.

Aug. 6, 1971.

Robert C. Erwin, of Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellant, Fields.

B. G. Johnson, Anchorage, for appellant, Bassett.

G. Kent Edwards, Atty. Gen., Juneau, Harold W. Tobey, Dist. Atty., Robert L. Eastaugh, Asst. Dist. Atty., Keith E. Brown, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., DIMOND, RABINOWITZ and CONNOR, JJ., and LEWIS, Superior Court Judge.

## OPINION

BONEY, Chief Justice.

Fields and Bassett appeal from convictions, after jury verdicts, of the offenses of assault with a dangerous weapon, attempted robbery, robbery, and grand larceny. Their grounds for appeal are nearly identical, and their cases will be considered together.

On October 12, 1967, Michael Warburton, Patrice Warburton, Betty Bryson, and her sons David and Michael Bryson were at the Warburton residence at Moose Pass, Alaska, on the Seward Highway. At about 10:30 p. m. two men wearing nylon stockings over their heads burst into the living room and held David Bryson and Michael Warburton at gunpoint, ordering them into the den and striking one of them who was slow to react. One of the assailants shot at the family dog. Betty Bryson, Michael Bryson, and Patrice Warburton appeared, and they were all told to lie down on the floor.

At about this time Mr. Leroy Bryson arrived at the residence. The assailants held him at gunpoint, searched him, and bound his hands. The two robbers also opened Mrs. Bryson's purse, dumped its contents on the floor, and went through her wallet.

After the robbers had made threats upon the victims, Leroy Bryson finally agreed to open the safe in the nearby jewelry shop belonging to the Warburtons. Mrs. Bryson and the children were left in the basement with the basement door jammed so that they could not get out. Upon entering the jewelry shop, the robbers took a substantial quantity of gold nuggets, casting gold, some currency, and commemorative coins. The robbers took Mr. Bryson back to the basement of the Warburton house where the other victims were present. According to Leroy Bryson there had been some talk about killing him by one of the robbers, but the other was against such a course of action. When Leroy Bryson was returned to the Warburton residence, all of the victims were tied up once again and the telephone was pulled off the wall. The robbers then left, and it took approximately 10 to 20 minutes before the Brysons and the others were able to free themselves. Leroy Bryson then hastened to a nearby place to call the police.

At approximately 1:20 a. m. on October 13th, Bassett and Fields were stopped by the Alaska State Troopers in a roadblock at Milepost 107 on the Seward Highway, about 80 miles from the scene of the robbery. No arrest was made, however, at that time. Bassett was driving a 1963 white Ford automobile which he had bor-

rowed from a friend. At trial Leroy Bryson testified that he was able to see the vehicle used by the robbers, and he described it as being white or cream-colored.

Fields and Bassett were subsequenly arrested on charges stemming from the jewelry shop robbery, and were brought to trial and convicted.

On appeal Fields and Bassett raise the issues (1) whether certain testimony tending to identify the defendant Fields was properly admitted, (2) whether the court erred in giving a supplemental verdict-urging instruction to the jury after it had been deliberating for nearly two days, and (3) whether the court erred in excluding certain testimony offered to impeach the witness Perry as to (a) his use of narcotics and (b) his reputation for truth and veracity.

## ADMISSION OF IDENTIFICATION TESTIMONY

We deal first with the appellants' contention that the trial court erred in admitting certain identification testimony of the witness Michael Warburton. Michael's identification testimony was prefaced by the state's request that the defendants place nylon stockings over their faces. Following this request the jury was excused and a substantial voir dire occurred during which the state atempted to justify its request. During the voir dire, Michael indicated, in response to a question by the court, that he could not identify either of the defendants beyond a reasonable doubt:

Q. Well, but the question is, can you identify anyone here now without a stocking over their head relative to the —who was in that house and—and—went through the activities you testified to?

A. I cannot do it without a reasonable doubt.

After the lengthy voir dire, the court ruled that it would not direct the defendants to wear nylon stockings. The jury was returned and the following testimony was heard:

Q. Michael, I ask you whether or not —you can look in the courtroom and whether you see the person or persons that you referred to having been in the Warburton home on October 12, 1967?

A. I cannot positively say that I recognize them.

Q. Now, you're saying then that there is some—some question in your mind as to exactness?

A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Based, Michael, on your observation of the men that you have referred to as being in the Warburton home on October 12, 1967, at the time of the robbery, do you see any persons present in the courtroom that you observed on this night?

&ast; &ast; &ast; &ast; &ast; &ast;

A. Yes, I think I can recognize somebody here.

Q. All right. Would you point that person whom you feel you recognize out please?

A. It is that man on the left (indicating).

Q. Can you describe him?

A. He is short, dark hair, dark features.

Q. I see. He's is sitting—the one sitting to the right of Mr. Brundin (indicating)?

A. Yes.

On cross examination, Michael indicated that he could not positively identify the defendants. However, he did state that he was rather certain of his belief that Fields was the man who was in the house when the crime was committed.

Appellants claim that this identification testimony was not sufficiently positive to become admissible, and that its admission was prejudicial because of the particular circumstances of this case, in which the assailants wore stockings over their faces. Four of the robbery victims were unable to identify either assailant. But there was

other evidence, besides the testimony of Michael Warburton, which pointed to Fields and Bassett as the perpetrators of the offense. The witness Leroy Bryson made a much more positive identification than did Michael Warburton. There was also circumstantial evidence which tended to identify appellants.

Appellants ask that we adopt a rule which would render identification testimony inadmissible unless the witness is positive. In support of such a rule appellants cite People v. Bryan, 27 Ill.2d 191, 188 N.E.2d 692 (1963); People v. Gardner, 35 Ill.2d 564, 221 N.E.2d 232 (1966); Ross v. State, 190 So.2d 187 (Fla.Ct.App.1966); People v. Barbosa, 254 Cal.App.2d 581, 62 Cal. Rptr. 212 (1967); United States v. Beigel, 254 F.Supp. 923 (S.D.N.Y.1966), affirmed 370 F.2d 751 (2d Cir. 1967); Peterson v. District of Columbia, 171 A.2d 95 (D.C. Mun.App.1961); and Hendrix v. United States, 327 F.2d 971 (5th Cir. 1964). The state counters this argument with authorities which permit the introduction of testimony less than positive. People v. Cahan, 141 Cal.App.2d 891, 297 P.2d 715 (1956), cert. denied, 352 U.S. 918, 77 S.Ct. 214, 1 L. Ed.2d 124 (1956); State v. Dutton, 83 Ariz. 193, 318 P.2d 667 (1957); State v. Williamson, 78 N.M. 751, 438 P.2d 161 (1968), cert. denied, 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed. 2d 170 (1968); People v. Lewis, 240 Cal. App.2d 546, 49 Cal.Rptr. 579 (1966); People v. Pleasant, 268 Cal.App.2d 28, 73 Cal. Rptr. 648 (1968); State v. Ellingson, 283 Minn. 208, 167 N.W.2d 55 (1969); Mason v. State, 244 Ind. 206, 191 N.E.2d 705 (1963); and Bustos v. People, 158 Colo. 451, 408 P.2d 64 (1965).

We find the cases cited by appellants to be distinguishable in one or more respects. In People v. Bryan, *supra*, and People v. Gardner, *supra*, there was substantial alibi evidence which had to be weighed against less than adequate eye witness identification. In both cases the issue presented was whether the evidence in its totality was sufficient to support a conviction. It is not contended in the case at bar that there was insufficient evidence for the case to go to the jury, but merely that the testimony of Michael Warburton should not have been admitted. In Ross v. State, *supra*, there was very little opportunity for the witnesses to even observe the distinguishing characteristics which would tend to identify the perpetrator of a larceny. The victim was unable to make any positive identification from photographs exhibited to him, but selected the pictures of several persons as being possible suspects. It was only at a later lineup that the victim selected a particular person as being the thief. The court employed the salutary rule that in order for the proof to be sufficient there must be an opportunity to observe the features, voice, mannerisms, or demeanor of the assailant so as to be able to isolate that person in the mind and memory of the witness with sufficient clarity to make a subsequent identification.

In People v. Barbosa, *supra*, the victim of the offense was very uncertain about the identity of the assailant, and only hearsay evidence was left with which to connect the accused to the commission of the crime. In Peterson v. District of Columbia, *supra*, the total evidence established only a possibility and not a probability that the accused was the perpetrator of the offense. Hendrix v. United States, *supra*, holds that there must be something more than a mere resemblance in order to establish identity of the accused, but that the testimony need not be entirely positive. In United States v. Beigel, *supra*, there was only one identifying witness. The method by which identification was achieved was fraught with defects. The discrepancies and contradictions in that identification were numerous.

Many of the cases dealing with the adequacy of identification testimony or evidence fall within a gray area in which the courts achieve a solution only through an analysis of the particular factual setting in which the issue is presented. In many of these cases the question is not the admissibility of identification testimony as such; it is whether the entire evidence, including the identification testimony, is sufficient to support a conviction.

The weight of authority favors the reception of such identification evidence even though it is less than positive in nature. As the ability of the witness to have observed accurately or to recall positively becomes less certain, so does the identification testimony become more like an item of circumstantial evidence, to be weighed with other evidence in determining the identity of the person who committed the crime. At some point the uncertainty of the witness may be so great as to render the testimony immaterial and thus inadmissible. But until that point is reached, the lack of postiveness goes only to the weight of the testimony, and its probative value is to be decided by the trier of fact. Many of the cases cited by the state are instances of this rule.

For example, in People v. Cahan, *supra*, the identifying witness was only able to say that "I believe" that the defendant was one of the robbery assailants. In upholding the conviction, the court observed:

> When a witness says 'I believe' he is not necessarily guessing. (Citation omitted.) To sustain a conviction, it is not necessary that identification of the defendant be positive and free of inconsistencies. (Citation omitted.) 'If the testimony of the identifying witnesses is worthy of credence and convinces the jury, the latter's finding is final unless the trial judge should with his intimate knowledge of the witness' behavior upset the verdict. It is not essential that the witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime. The want of positiveness goes only to the weight of the testimony.' 297 P.2d at 719.

A case similar to the one before us is State v. Williamson, *supra*. There the perpetrators of the robbery wore nylon stockings and pieces of a towel to conceal their facial identity. The witnesses could testify about the similarity of the felons with that of the accused only as to height, weight, age, quickness of action and movement. One witness observed that one of the robbers had dark bushy hair, which was very similar to that of one of the defendants. In upholding the conviction the court stated:

> It is not essential for a conviction that a positive identification be made of the accused. It is sufficient if the witnesses testify that in their belief, opinion or judgment the person accused is the person who perpetrated the crime and want of positiveness goes only to the weight of the testimony. 438 P.2d at 164.

Another case concerning a masked robber, Bustos v. People, *supra*, is to like effect. Under these authorities we are persuaded that the admission of the testimony of Michael Warburton was proper.

## THE ALLEN CHARGE

Appellants assert that the trial court erred in giving a supplemental verdict-urging instruction to the jury over objections of both the prosecuting attorney and the counsel for both defendants. The instruction was, with one potent exception, substantially similar to what is commonly known as the Allen Charge.[1] This instruction was delivered on the trial court's own motion after the jury had failed to return a unanimous verdict by the third morning of deliberations. The charge was a relatively long one and is set out fully below.[2]

1. The name "Allen charge" is derived from the Supreme Court's approval of a somewhat similar charge in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

2. The charge read:
   Although the verdict to which a juror agrees must, of course, be his own verdict—the result of his own convictions and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some

■ We hold that the traditional Allen type charge, by virtue of emphasizing the duty of the minority jurors to reconsider their views without a like admonition to the majority, is so inherently fraught with coercive tendencies that its use cannot be justified.[3] The contrary holdings in Chase v. State[4] and Gafford v. State[5] are overruled.

Moreover, scrutiny reveals that the challenged instruction included additional non-Allen type language which rendered it undeniably and necessarily coercive. Its vice was a serious one soundly condemned by prior authority. Its use should not pass this court unnoticed.

The court in concluding its charge instructed:

> With that admonition you are *directed to continue your deliberations until you arrive at a unanimous verdict.* You will again retire to your jury room and continue your deliberations. (Emphasis supplied.)

It is our view that a jury would naturally conclude that the judge's charge meant exactly what it said, that the jury would be required, as directed, to continue deliberations until they arrived at a unanimous verdict. Such a requirement is clearly contrary to our law.[6]

The instruction in effect demanded agreement, and it is not possible for us to

---

time be decided; that you are selected in the same manner, and from the same source, from which any future jury must come; and there is no reason to suppose that the case will ever be submitted to twelve persons, twelve men and women more intelligent, more impartial, or more competent to decide it, nor that more or clearer evidence will be produced on one side or the other. With this in view, it is your duty to decide the case if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof —the burden is upon the State to establish the guilt of the defendants beyond a reasonable doubt, and if you are left in doubt as to the guilt of the defendants, or either of them, such defendant or defendants is entitled to the benefit of that doubt and must be acquitted. But, in conferring together you ought to pay proper respect to each other's opinions and reasons, with the disposition to be convinced with each other's arguments. And, on the one hand, if much the larger number of you are for a conviction, the dissenting jurors should consider whether the doubt in their own minds is a reasonable one which makes no impression upon the minds of so many men and women equally honest, and equally intelligent, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if the majority of

you are for acquittal, the minority should equally ask themselves whether they may not reasonably and ought to doubt the correctness of the judgment which is not concurred in by a number of those with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellows. With that admonition you are directed to continue your deliberations until you arrive at a unanimous verdict. You will again retire to your jury room and continue your deliberations.

3. Mangan v. Broderick and Bascom Rope Co., 351 F.2d 24, 30 (7th Cir. 1965), cert. denied, 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 846 (1966) ; Green v. United States, 309 F.2d 852, 855 (5th Cir. 1962), and *see* Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 139–40; Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge", 31 U.Chi.L.Rev. 386 (1964).

4. 369 P.2d 997, 1004–1005 (Alaska 1962).

5. 440 P.2d 405, 415–416 (Alaska 1968).

6. The American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 148 (Approved Draft 1968) states:

> [I]t is clear that the trial judge may not tell a disagreeing jury that he will keep them *together* indefinitely or until they agree upon a verdict. Boyett v. United States, 48 F.2d 482 (5th Cir. 1931) ; State v. Rodman, 208 La. 523, 23 So.2d 204, (1945) ; Character v. State, 212 Miss. 30, 53 So.2d 41 (1951).

see how such a charge may be justified. This is the judge speaking, and these are his final words; they constitute the final impression made upon the jury before deliberations resumed. When this is recognized, it is obvious that the judge subjected the jury to pressure of a degree and of a type never approved in the Allen Charge.

The instruction here is not an Allen Charge but a reasonably accurate paraphrase of it followed by a substantial addition not embraced within the more carefully measured language of the Allen Charge. The Allen Charge alone, unaccented and unembellished, is severe enough.[7] The elaboration upsets that delicate balance which has allowed prior Allen Charge approval.[8] Repeatedly, it has been declared that the Allen Charge represents the limit to which a judge may go in urging a verdict.[9] That limit having been exceeded here, error is apparent.

The import of the instruction is that a criminal trial must end with either a verdict of guilty or not guilty. Yet, this is not the law for there is no requirement that a jury agree.[10] A hung jury is a legitimate end of a criminal trial, and is the occasionally inevitable result of requiring a unanimous verdict beyond a reasonable doubt.

Here a jury was subjected to the direction to continue deliberations, "until you arrive at a unanimous verdict". A jury member so instructed faces but three choices: (1) to convince all beyond a reasonable doubt, (2) to surrender, without conviction, a view conscientiously held; or (3) to remain together indefinitely in the absence of unanimous agreement. For a minority juror unable to persuade the others and unwilling to surrender a conscientious belief, confinement of all by his belief is the only choice. Can anyone say that such a result does not generate pressures that are coercive? Most assuredly surrender to majority rule must follow for an average juror.[11] Moreover, subjection to pressure of this nature with its total irrelevance to innocence, guilt, or the evi-

7. United States v. Smith, 303 F.2d 341, 343 (4th Cir. 1962).

8. It is significant that in those cases in which this court has approved the Allen Charge there was an absence of the additional balance-destroying language found here. In Gafford v. State, 440 P.2d 405, 416 n. 53 (Alaska 1968), the court specifically noted that the supplemental charge was a "balanced one".

9. United States v. Harris, 391 F.2d 348, 354 (6th Cir. 1968); Green v. United States, 309 F.2d 852, 855 (5th Cir. 1962); United States v. Smith, 303 F.2d 341, 343 (4th Cir. 1962); Powell v. United States, 297 F.2d 318, 321 (5th Cir. 1961); United States v. Rogers, 289 F.2d 433, 435 (4th Cir. 1960).

10. United States v. Harris, 391 F.2d 348, 355 (6th Cir. 1968); Thaggard v. United States, 354 F.2d 735, 740 (5th Cir. 1965) (Coleman, J., concurring), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); Williams v. United States, 119 U.S.App.D.C. 190, 338 F.2d 530, 533 (1964); Green v. United States, 309 F.2d 852, 856 (5th Cir. 1962); Huffman v. United States, 297 F.2d 754, 759 (5th Cir.) (Brown, J., dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962).
As long ago as 1909, the United States Supreme Court said that the Fifth and Fourteenth Amendments invest courts with the authority to discharge a jury without a verdict whenever there is, after due deliberation, "a reasonable probability that the jury could not agree". Keerl v. State of Montana, 213 U.S. 135, 138, 29 S.Ct. 469, 470, 53 L.Ed. 734, 737 (1909).

11. This conclusion is obvious when one considers the inevitable pressures generated by a dissenting juror's realization that all must remain confined indefinitely because of his individual beliefs. That these pressures are particularly acute where, as here, the jurors are in their third day of deliberations is apparent. Common sense demands recognition of the desire of jurors to return to the life from which they have been uprooted. To presume that an average juror will not recognize and succumb to these pressures in the face of indefinite confinement is to presume the absurd.

dence at trial finds little justification in our law.[12]

The jury here was charged with more than a duty to carefully consider; it was in effect forced to reach a unanimous decision. The language of the charge being a basic and coercive misconception of our law transforms what was in all likelihood an innocent attempt at expediency into positive error. For in the face of the plain meaning of this charge it is simply absurd to say that a juror was left free and unfettered to stand by his conviction. Nor can we assume, when dealing with the vital rights of the lay juror and criminal accused, that the judge did not intend to execute his instruction or that the jury would question his sincerity.

When the verdict-urging charge was delivered at least one juror was opposed to conviction. Following its pronouncement, any dissenter faced the alternative of surrendering his sincere conviction or compelling his fellows to remain together indefinitely. In our view such a choice is coercive. That juror coercion is error under our law is so clear as to not require elaboration.

The United States Supreme Court in Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), indicated the proper disposition of the case before us.[13] There the defendant was convicted by jury verdict of robbery. Prior to reaching their verdict the jury had informed the court they were unable to reach a decision. The judge responded stating:

> Now, I am not going to accept this. You have got to reach a decision in this case.[14]

Defendant did not object at trial, but raised the issue for the first time on appeal,[15] where the United States Circuit Court, one judge dissenting, affirmed stating:

> We see no basis whatever for characterizing these statements as coercive, especially as the jury did not reconvene and resume its deliberation until the following day.[16]

The United States Supreme Court granted certiorari, 379 U.S. 944, 85 S.Ct. 442, 13 L.Ed.2d 542, to determine if "the statement was coercive". The court in a *per curiam* opinion noted that the Solicitor General stated in his brief:

> Of course, if this Court should conclude that the judge's statement had the coercive effect attributed to it, the judgment should be reversed and the cause remanded for a new trial; the principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration.[17]

12. In condemning the practice of inquiring into the numerical division of a jury unable to agree, the United States Supreme Court has indicated "every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded." Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 136, 71 L.Ed. 345, 346 (1926). The court has expressed a similar view in reference to pretrial publicity while quoting Justice Holmes:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence. * * *

Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 614 (1966). Quoting from Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907). In view of the pressure created by the threat of indefinite confinement the jury may well have been influenced by irrelevant factors, and there is danger the verdict was not "induced only by evidence and argument in open court".

13. The thrust of the language condemned by the Court is identical with the present case, and while the opinion does not disapprove the Allen Charge, the reason is apparent for the violative language is, as here, not part of the Allen Charge.

14. Jenkins v. United States, 117 U.S.App. D.C. 346, 330 F.2d 220, 221 (1964), rev'd, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

15. Id.

16. Id. at 221.

17. 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957, 958 (1957).

The court concluded that the statement had a coercive effect and reversed the conviction.

Other judicial decisions indicate disapproval of the challenged instruction. In Powell v. United States, 297 F.2d 318, 320 (5th Cir. 1961), the court instructed:

'If you follow the principles of law given you by the Court and if you recall the evidence in this case you ought to be able to agree upon a verdict. * * *'

That instruction was found coercive. In Green v. United States, 309 F.2d 852, 855 (5th Cir. 1962), the following instruction was held to far exceed the permissible limits of the Allen Charge:

* * * [I]t is the duty of the minority to listen to the argument of the majority with some distrust of their own judgment because the rule is that the majority will have better judgment than the mere minority * * *

The instruction was said to have "prejudiced the right of an accused to a hung jury and a mistrial by tending to stifle the dissenting voices of minority jurors".[18]

■ We hold that reversal is compelled in this case. For a jury to be faced with the prospect of indefinite service is so inherently and invariably coercive as to require reversal. Our holding that the threat of continued indefinite confinement is coercive is amply supported.[19]

Even if coercion were not so apparent here, that is, if the coercive nature of this instruction was a close question, we believe that pragmatic considerations and policy require that the doubt be balanced in favor of the defendant and the case reversed. We reach this conclusion because the coercive impact of a questionable charge is almost always difficult to evaluate precisely on appeal.[20]

■ When the coercive impact of a questionable practice cannot be assessed accurately, pragmatic concern for defendants' rights, impartial trial and the integrity of the jury process dictates that the use of a questionable charge be proscribed. There is danger that where proof of prejudice is difficult, a defendant's right to a fair trial by an impartial jury will be violated with a consequent denial of due process. Where practical considerations pose special difficulties of proof in regard to vital rights, policy supports the formation of practices to protect those rights.[21]

18. *Id.* at 856.

19. It has been held that it is error for a judge to tell a jury that they have a duty to or must agree. Thompson v. Allen, 240 F.2d 266, 269 (10th Cir. 1956) (Dicta that an instruction is coercive if "it gave the jury the impression they must reach a verdict"); State v. Rodman, 208 La. 523, 23 So.2d 204, 205 (1951) ("The Court will not accept a mistrial and you must deliberate further"); People v. Barmore, 368 Mich. 26, 117 N.W.2d 186 (1962) ("duty to agree"); *see also* Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 136 (1968), where it is stated:

It is error for the judge to tell jurors that they have 'got to' or 'must' agree. Since a jury is at perfect liberty to hang, the instruction that it has a duty to decide the case is impermissible. (Footnote omitted.)

It has also been held improper for a court to threaten or express an intention to confine a jury indefinitely or until they agree. Boyett v. United States, 48 F.2d 482, 484 (5th Cir. 1931) (Coercive for a judge to tell a jury he intended "keeping them sequestered indefinitely until they reached a verdict").

20. Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345, 346 (1926). *See also* American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 153 (Approved Draft 1968); Note, Due Process, Judicial Economy, and Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123, 135–36 (1967); Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge", 31 U.Chi.L.Rev. 386, 391 (1964).

21. Certain rules propounded by the United States Supreme Court illustrate a pragmatic concern for the preservation of vital rights where the establishment of prejudice is difficult. In Gideon v. Wainright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), for example, the

Therefore, even if we were not convinced that the error here was obvious, we would favor balancing the question of prejudice in favor of defendant.

Having considered the specific charge before us, we turn to a general review of Allen-type charges in an effort to provide sufficient guidance to alleviate future error.

Since its initial approval in the *Allen* decision, the Allen charge has become a standard tool of both state and federal judges. However, the descendants of *Allen* have exhibited numerous variations of the basic theme that the necessities of judicial economy require that when jurors find themselves divided, they must re-examine their convictions in an attempt to reach a verdict. As a result, state and federal courts have repeatedly been faced with determining whether the Allen charge—or something resembling it—constitutes an unwarranted intrusion by the court upon the province of the jury. Federal circuit courts of appeal have frequently upheld a properly limited charge.[22] Recently, however, use of the Allen-type charge has been severely questioned by the courts,[23] the commentators,[24] and the American Bar Association Project on Minimum Standards for Criminal Justice.[25]

Much of what was generally accepted in 1896, when *Allen, supra,* was decided is not good law today. Contemporary criticisms of the Allen charge indicate that it is less an object of commendation than toleration.[26] Recent court opinions and

right to counsel in criminal proceedings was held to apply automatically absent a showing of special circumstances as required in Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). The new rule was grounded in part upon the realization that problems of proof and appellate review had rendered the prior rule ineffective as a method of preserving fair trial. The rule of Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), that where virtual total exclusion of a group from jury service is shown, the burden of showing it does not stem from discriminatory practices shifts to the state, is equally pragmatic. Also notable is the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which while not directly related to problems of proof and prejudice, was premised upon the need for a practical method of discouraging unconstitutional searches and seizures.

22. *See, e. g.,* cases cited in United States v. Fioravanti, 412 F.2d 407, 415 at n. 19 (3rd Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

23. *See, e. g.,* United States v. Thomas, D.C.Cir., Sept. 14, 1971; United States v. Johnson, 139 U.S.App.D.C. 193, 432 F.2d 626 (1970); United States v. Brown, 411 F.2d 930 (7th Cir. 1969); United States v. Fioravanti, 412 F.2d 407 (3rd Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); Thaggard v. United States, 354 F.2d 735, 739 (5th Cir. 1965) (Coleman, J., concurring), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L. Ed.2d 301 (1966); Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962); Andrews v. United States, 309 F.2d 127, 129 (5th Cir. 1962) (Wisdom, J., dissenting), cert. denied, 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970 (1963); Huffman v. United States, 297 F.2d 754, 755 (5th Cir. 1962) (Brown, J., dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962).

24. Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100 (1968); Note, Due Process, Judicial Economy, and the Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. (1967); Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge", 31 U.Chi.L.Rev. 386 (1964).

25. American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 145–156 (Approved Draft 1968).

26. In 1963, Mr. Justice Clark made the following assessment of the Allen charge: "Nor do we circulate the 'Allen charge' to new judges as I used to do when heading up the criminal division in the Department of Justice. Allen is dead and we do not believe in dead law." Clark, Progress of Project Effective Justice—A Report on the Joint Committee, 47 J.Am.Jud. Soc'y 88, 90 (1963). The Fifth Circuit has indicated that "[t]here is small, if any, justification for its use" today. Green v. United States, 309 F.2d

scholarly commentary reveal a growing concern with the potentially coercive effects of the Allen charge upon the minority jurors. Two state appellate courts have used their supervisory power to abolish the practice of instructing potentially hung juries on their responsibility to reach a verdict.[27] The Fifth Circuit has indicated dissatisfaction with the charge on a number of recent occasions,[28] and two judges on that court have argued that it is unconstitutional.[29] The Seventh Circuit[30] and the District of Columbia Circuit[31] have both proscribed its future use, while the Third Circuit[32] has severely limited if not completely prohibited the giving of the Allen charge. Agreeing with these judicial criticisms, the commentators have recommended that it be modified, infrequently invoked, or abolished.[33]

It is obvious from our review of the recent authorities that a new approach to the use of the Allen charge is evolving. Current analysis seriously questions the propriety of giving the instruction in its traditional form. When the Allen charge is discussed today, common critical themes consistently appear. The most important of these is the fear that the minority jurors will be coerced by the charge and fail to render a verdict truly representing their conscientious convictions. This coercive influence is generally viewed as a function of the context in which the charge is given and of the inherently unbalanced nature of the Allen charge itself. This latter factor results because the charge emphasizes reexamination by the minority of the jurors in light of the fact that the majority who are equally honest and dedicated disagree.[34]

At the very least, the Allen charge encourages majority inaction by failing to emphasize any need for reevaluation of the majority's viewpoint. As a result, there is a possibility of substituting a numerical preponderance for the requirement that a verdict not only be unanimous but representative of the honest convictions of each individual juror.

The coercive tendency of the Allen charge requires that its use be discontinued in this state. It has been suggested that a mistrial from a deadlocked jury is a safeguard to liberty.[35] It has also been observed that the law generally attempts to protect juries from potentially coercive influences.[36] Instructions which tend to be coercive must, of course, be avoided to prevent unnecessary infringement upon the jury function. We must now consider

852, 854 (5th Cir. 1962). In concurring in Thaggard v. United States, 354 F.2d 735, 739 (5th Cir. 1965), Judge Coleman asserted that if the Allen charge "were submitted to the Supreme Court today the result might not be the same as it was in 1896."

27. State v. Randall, 137 Mont. 534, 353 P.2d 1054 (1960); State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959).

28. Walker v. United States, 342 F.2d 22 (5th Cir. 1965), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965); Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962).

29. Thaggard v. United States, 354 F.2d 735, 739 (5th Cir.) (Coleman, J., concurring), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); Huffman v. United States, 297 F.2d 754, 755 (5th Cir. 1962) (Brown, J., dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962).

30. United States v. Brown, 411 F.2d 930 (7th Cir. 1969).

31. United States v. Thomas, D.C.Cir., Sept. 14, 1971.

32. United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969).

33. See n. 24, supra.

34. For the specific wording of the charge under consideration in the present case, see n. 2, supra.

35. Huffman v. United States, 297 F.2d 754, 755 (5th Cir. 1962) (Brown, J., dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962).

36. See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (pretrial publicity); Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (Mob dominated trial).

alternatives more likely to insure the free and unfettered operation of the jury.

■ The use of a properly circumscribed supplemental instruction following a deadlock somewhat similar to the one given in the present case may serve a beneficial purpose in the adjudication of cases. However, having considered the Allen charge, we conclude that it is time to adopt a new and less objectionable instruction. We direct that in the future trial courts comply with the standards recommended by the American Bar Association Project on Minimum Standards of Criminal Justice. The recommended standard, which received the approval of the House of Delegates, is set out below:

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.[37]

This procedure was recently adopted by the Seventh Circuit in United States v. Brown [38] and the District of Columbia Circuit in United States v. Thomas.[39] This approach impresses the jurors at the outset with the magnitude of their duties while, at the same time, it provides a balanced instruction. It does not tend to place the holders of a minority viewpoint in a vulnerable position and is comparatively free of coercive language. With these benefits in mind, we find it significant that the American Bar Association Project set out in its commentary an illustrative instruction which it considered consistent with the standard. We suggest that when a trial judge is faced with an apparently deadlocked jury the recommended instruction be considered. This approach will yield uniformity and predictability, and should eliminate appeals based upon technical variations in language. For convenience and guidance, the recommended instruction is quoted: [40]

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

---

37. *See* American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 145–146 (Approved Draft 1968).

38. 411 F.2d 930 (7th Cir. 1969).

39. D.C.Cir., Sept. 14, 1971.

40. It should be emphasized that the instruction is not an Allen charge. The

ABA Committee, in fact, specifically concluded that "the instruction commonly referred to as the *Allen* charge or 'dynamite charge' should not be given to a jury * * *." American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 146 (Approved Draft 1968).

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.[41]

Our holding that error was committed in submitting to the jury an Allen-type charge is in itself sufficient to require reversal of the appellants' convictions. To avoid the possibility of further error being committed upon retrial of this matter, however we find it appropriate to consider the remaining points of error raised on appeal.

ATTEMPTED IMPEACHMENT OF MICHAEL PERRY

In the course of the trial below, the prosecution relied primarily on the testimony of Michael A. Perry to establish its case against the appellants. Perry admitted that he had surveyed the Warburton Jewelry Shop at Moose Pass with an eye to burglarizing it, and that he had discussed the project with Bassett and Fields. Perry stated that he concluded that the burglary would be too risky, and thus abandoned the project. According to Perry, several days after the robbery he was contacted by Bassett and Fields, who asked him to assist them in selling some gold. Perry agreed, and actually succeeded

in selling a portion of the gold which had been given to him. He returned the proceeds from the sale along with the remaining gold to Fields. Perry further claimed that he learned from Fields that the gold which he sold had been stolen from the jewelry shop at Moose Pass.

Defense counsel made concerted efforts to impeach Perry's testimony. On cross-examination, inquiry was made into Perry's motives for testifying. Perry revealed that, in return for his testimony, the district attorney had promised him immunity from prosecution stemming from the alleged incident. He acknowledged the fact that he had given testimony in other criminal cases in return for immunity. Additionally, Perry freely admitted that he had been convicted of felonies on numerous previous occasions. The defense further sought to discredit Perry's testimony by attempting to show, both on cross-examination and through the testimony of witnesses, that Perry had used and was addicted to narcotics. On cross-examination by Bassett's counsel the following exchange occurred:

Q. Are you a dope addict?

A. No, I'm not.

Q. Are you under the influence of any narcotic right now?

A. No I'm not.

Q. Could I have a look at your arm?

A. Yeah, you can look.

[PROSECUTOR]: Object as being irrelevant and immaterial, Your Honor. The witness has testified. If counsel wishes to bring forward some evidence to substantiate his inference that this witness at this time is under any type of drug the state has no objection to it, but the question has been asked, it has been answered and I object to any type of inferences being raised by the witness' negative answer.

THE COURT: Sustained.

41. American Bar Ass'n Project on Minimum Standards for Criminal Justice, Trial by Jury 146–47 (Approved Draft 1968). This instruction is instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97–98 (1961).

This attempted impeachment was temporarily abandoned, and no offer of proof was made by defense counsel. At a later point counsel for Fields probed further into this subject. Perry denied that he was a narcotics addict, either in the past or currently. Although the prosecutor objected to these questions, and most of the objections were sustained, answers in the negative were given. No motion to strike these responses was made by the state.

Later in the proceedings, one Donald Chambers was called by the defense. Counsel offered to prove that Chambers observed Perry injecting himself with heroin in July or August of 1968. The court refused to admit this testimony. The defense also sought to introduce testimony by Mildred McGalliard that Perry entered her house in the fall of 1968 with black and blue arms, and that he admitted to "shooting smack". Again the court excluded this testimony.

We turn first to the question whether evidence of heroin addiction should be routinely admissible to impeach the testimony of a witness. Some courts have taken this view. State v. Fong Loon, 29 Idaho 248, 158 P. 233 (1916); State v. Prentice, 192 Iowa 207, 183 N.W. 411 (1921); Diblee v. State, 202 Ind. 571, 177 N.E. 261 (1931); Beland v. State, 86 Tex.Cr.R. 285, 217 S.W. 147 (1919). Such cases usually proceed from the premise that heroin addicts become, by virtue of their use of the drug, depraved, pathological liars who are incapable of distinguishing reality from appearance. These cases represent a distinctly minority view.[42]

There may, in fact, be justification for introducing evidence of heroin use and addiction to impeach a witness where the evidence pertains either to the time of the occurrences which the witness has observed or to the time of trial. In such instances, use of heroin could potentially affect the capacity of the witness to accurately observe or relate details of the events which he has seen. But we cannot accept a rule under which persons who use or are addicted to heroin are considered necessarily and inherently unreliable as witnesses. The rule thus stated is based upon a "common knowledge" which is scientifically unsound and which has been rejected by the more penetrating judicial opinions on the subject.[43] See, e. g., Kelly v. Maryland Cas. Co., 45 F.2d 782 (W.D.Va.1929); People v. Williams, 6 N.Y.2d 18, 187 N.Y. S.2d 750, 159 N.E.2d 549 (1959); see also People v. Bell, 138 Cal.App.2d 7, 291 P.2d 150, 152–153 (1955).

■ We therefore hold that evidence of narcotics use or addiction will not be admissible where its only purpose would be to impeach a witness by showing that he is, by sole virtue of his addiction, inherently unreliable. Our holding does not mean that evidence of addiction to heroin will never be admissible to impeach a witness. Where evidence of addiction tends to show that the witness was under the influence of narcotics either at the time of trial or at the time of the occurrence to which he testifies, where the evidence proves that his ability to perceive, remember, and testify are substantially affected by his habit, or where such evidence would

42. For a review of cases dealing with this topic, see Annot., 52 A.L.R.2d 848 (1957).; People v. Williams, 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549 (1959); Note, Testimonial Reliability of Drug Addicts, 35 N.Y.U.L.Rev. 259 (1960).

43. Considerable scientific evidence has been amassed to support the view that heroin addicts, as a class, are competent witnesses, absent a particularized showing of drug caused facultative impairment, and assuming the accessibility of a regular supply of the drug. This evidence may be to some extent undermined by authorities indicating that drug addiction is frequently symptomatic of deep-seated psychological and emotional disturbances of the type which might render an individual prone to lie on the witness stand. See generally Note, Testimonial Reliability of Drug Addicts, supra n. 42. Presumably, under appropriate circumstances, such psychological disorders could be proven without recourse to evidence of heroin addiction.

be independently admissible under some other theory, it should not be excluded.

■ Turning next to a consideration of the circumstances of the present case, we conclude that the evidence proffered by the appellants against Michael Perry should have been admitted. Initially, we feel that the proof excluded by the trial court was at least somewhat probative of the issue of Perry's condition at the time of trial. The very exclusion of that proof makes it impossible to know whether the appellants would have succeeded in establishing that Perry was under the influence of narcotics at the time his testimony was rendered. Yet it would seem that the appellants' efforts at impeachment were more than a random and unfounded fishing expedition; the significant observation is that the appellants might well have proven successful in their efforts had not the trial court so readily excluded the evidence which they sought to produce.[44]

Although we are inclined to think that the evidence offered by the appellants was not wholly irrelevant on the question of Perry's condition on the stand, we believe that there is a compelling, independent reason for the admission of this evidence even assuming that it was not sufficiently probative of Perry's condition at the time of trial.

In the circumstances of the present case, the rejected evidence of heroin use by Perry was, in our view, independently relevant apart from its tendency to establish that Perry was unreliable in the sense that all drug addicts are unreliable. To be specific, we hold that Perry's use of narcotics was crucially relevant to show the possibility that his testimony was colored by bias—"the slanting effect upon human testimony of the emotions or feelings of the witness toward the parties or the self-interest of the witness in the outcome of the case."[45]

In Whitton v. State, 479 P.2d 302, 316–318 (1970), this court addressed itself to the issue of bias, stating:

Because this human tendency is so common and well known, reasonable latitude must be allowed in the cross-examination of a witness, and also in the introduction of extrinsic testimony, to bring out facts and circumstances which, when tested by human experience, tend to show that the witness may be biased.[46]

This court further noted in *Whitton* the particular susceptibility to bias of state informers, quoting with approval the language of Hughes v. United States, 427 F.2d 66, 68 (9th Cir. 1970):

[T]he defense should always have the opportunity to show by way of cross-examination or otherwise that the actions of a government informer may have been impelled by an expectation of leniency. * * *

Here, like in *Whitton,* the bearing of the excluded evidence on the issue of bias may be easily perceived. As a witness, Perry was serving in the capacity of a police informer, and had been promised immunity from prosecution on any charges relating to the incident concerned in the case. Given this information alone, a jury might reasonably conclude that Perry's sole motive for testifying was the desire for immunity, and that his testimony could therefore be relied upon as truthful. Yet proof that Perry was a user of narcotics would have revealed additional possible motives for his testimony, and these motives would hardly have been conducive to testimonial accuracy.

Users of narcotics regularly engage in behavior deemed reprehensible by society and proscribed by law. Heroin addicts require regular doses of the drug. Given

---

44. Similar attempts at impeachment have been ruled admissible in other jurisdictions. *See, e. g.,* People v. Gonzales, 217 Cal.App.2d 41, 31 Cal.Rptr. 540 (1963); People v. Lewis, 25 Ill.2d 396, 185 N.E.2d 168 (1962).

45. C. McCormick, The Law of Evidence § 40, at 82–83 (1954).

46. 479 P.2d at 317.

these two facts, it is not difficult to see that pressure to testify can easily be brought to bear on the addict by police. Threatened by prosecution for possession of contraband or faced with the prospect of seeing the source of his supply dried up, a heroin user might in many instances be quite willing, regardless of the truth, to tell a story which he feels will be likely to please the authorities and to work to his advantage.[47] It is just such an inference which proof of Perry's drug use would have tended to raise.

Under the well settled rules of evidence, the appellants should have been entitled to prove bias. The ruling of the trial court excluding the testimony of Chambers and McGalliard and preventing Perry from showing the condition of his arms unjustifiably thwarted the appellants' attempts to this end, thereby preventing a full and fair disclosure of Perry's possible motives for testifying. Again, it is relevant to consider that Perry's testimony was vital to the prosecution, and that the issue of his credibility was therefore a crucial one. Because of the plain bearing of the evidence offered by the appellants on the issue of bias, we think that its exclusion was unwarranted.

An alternative basis for the admission of the evidence of Perry's heroin use exists and is worthy of mention. Perry testified, in response to questions posed by defense

counsel, that he had not previously used narcotics. The evidence offered by the appellants should properly have been admitted to contradict Perry's statements on the stand.[48] If the testimony of witnesses McGalliard and Chambers was not independently admissible, it might be regarded as collateral and therefore inadmissible for the sole purpose of contradicting Perry.[49]

■ However, the established evidentiary rule is that contradiction of a witness' testimony is permissible by means of extrinsic evidence when such evidence is not collateral—that is to say when the extrinsic evidence would otherwise be admissible. Because we believe that the testimony of Chambers and McGalliard would have been admissible on the issue of bias, it would not have been collateral.[50] Moreover, the appellants' request to have Perry bare his arms was obviously directed at contradiction of his testimony. This request was part and parcel of the appellants' cross-examination; it was in no sense extrinsic evidence, and should therefore have been admissible for the purpose of contradiction regardless of whether it might otherwise have been collateral.[51]

■ The next claim of error centers around the attempt to impeach Michael Perry by showing that his community reputation for truth and veracity was bad.

At trial, the defense called the witnesses Chambers and McGalliard to testify con-

---

47. As the court stated in Kelly v. Maryland Cas. Co., 45 F.2d 782, 786 (W.D. Va.1929):

> Practically every intelligent layman has heard of, and many have also read of, the frightful sufferings endured by drug addicts when deprived of a supply of the needed drug. * * * Certainly such fears [fears of being deprived of the drug] supply a powerful motive for deception which does not exist in respect to matters in general.

48. On appeal, the state has insisted on the point that Perry, on cross-examination, was asked only whether he was addicted to heroin, and not whether he had ever used heroin. Similarly, the state underscores the fact that the testimony of witnesses Chambers and McGalliard related only instances of use of the drug, and could not be sufficient to prove addiction. We think that in the context of the present case these distinctions are overly technical. The testimony of Chambers and McGalliard, considered together, provides a strong indication of possible addiction. Moreover, the offer of medical testimony rejected by the court might well have strengthened the bearing of this evidence on the issue of actual addiction.

49. See generally C. McCormick, The Law of Evidence §§ 34, 47 (1954).

50. Id. at § 48, p. 102. IIIA J. Wigmore, Evidence § 1005(b), (c) (Chadbourn rev. 1970).

51. C. McCormick, The Law of Evidence § 47 (1954).

cerning the reputation of Perry for truth and veracity. After objection, this proffered testimony was excluded by the court for lack of an adequate foundation. Appellant contends a proper foundation had been laid and that the trial court committed prejudicial error in failing to admit the testimony. The state argues that a proper foundation was not laid and that the testimony was correctly excluded. The requirement of a proper foundation before a witness is allowed to testify concerning another witness' reputation in the community is an important one, and must not be wholly disregarded. Yet this is an area which has often proven unnecessarily confusing, and in which technicalities have frequently been permitted to prevail over substance. The ultimate goal of the foundation requirement has been well described in Whiting v. United States, 296 F.2d 512, 517 (1st Cir. 1961) (citations omitted):

> It is fundamental that to qualify a witness as competent to give testimony concerning a defendant's character and reputation in the community it is usually required that there be a showing that the statements uttered by the witness are representative. * * * In short, there must be some demonstrable basis evincing the competence of the witness to give his opinion.

Upon review of the record, we are convinced that an adequate basis for the reputation evidence was presented below. Rejection of this evidence by the trial court resulted, in our view, in an overly restrictive application of the foundation requirement.[52]

Were this the only error committed by the trial court, we would be inclined to hold that it was harmless. However, in view of the other errors below, we do not think that the exclusion of the reputation evidence may properly be regarded as insignificant.

The appellants' convictions are reversed, and these cases are remanded to the superior court for a new trial to be conducted in conformity with the views expressed in this opinion.

ERWIN, J., not participating.

CONNOR, Justice (concurring in part and dissenting in part).

I agree with the majority opinion except that portion which holds it error to exclude the testimony of the witnesses Chambers and McGalliard, elicited for the purpose of impeaching the witness Perry.

The testimony about Perry using or admitting to the use of narcotics is so remote from the critical events in this case that it could not, in my opinion, establish a drug-caused, faculative impairment at the times critical to Perry's testimony.

The exclusion of the testimony of these witnesses about Perry's reputation for truth and veracity is, in my view, harmless error. Perry's reputation was thoroughly impeached by his own testimony. When asked on the witness stand whether he had not always been a law-abiding citizen, Perry answered, "No, I don't believe I've ever been one." And while he would not quite admit to being a professional criminal, he did allow that he had committed "quite a few crimes," and had been convicted of at least three or four burglaries. Moreover, he admitted to complicity in the case at bar. He testified that he had gone to Moose Pass with the intention of burglarizing Warburton's store, but had failed to do it because he did not think he could get away with it. At a later point he discussed the feasibility of burglarizing the shop with Fields and Bassett. Perry testified that he willingly took charge of selling the stolen gold after the jewelry shop was burglarized. Lastly, Perry admitted to being promised immunity in this and other

52. It is further relevant to note that upon retrial of this matter our recent decision in Freeman v. State, 486 P.2d 967 (Alaska, 1971), will apply to make admissible testimony based upon the personal opinion of the witnesses.

cases if he "blew the whistle" on Bassett and Fields.

In the light of such testimony, either the admission or exclusion of the rather anemic testimony about Perry's reputation for truthfulness becomes something of a superfluity.

LEWIS, Superior Court Judge (concurring in part and dissenting in part).

I would affirm the convictions.

I agree with the dissent of Justice Connor respecting the impeachment testimony of the witness Perry.

I would treat as harmless error the language of the "Allen Charge" of the trial court, although I am in accord with the majority respecting future employment of a supplemental instruction when a deadlock is announced to the court. The standards recommended by the American Bar Association project on minimum standards of criminal justice should in future cases be adhered to.

However, the charge given here by the trial court, while arguably imperative in its command to continue deliberation until a verdict is reached, does not, in my view, deprive the jury of its free will in either reaching a verdict of conviction or acquittal, or in subsequently determining with finality that they were hopelessly unable to agree. The direction to continue deliberations until a unanimous verdict is reached, if considered a "dynamite charge", is, in my view, defused by the language with which the instruction commences whereby the jurors are reminded that the verdict must be the result of the convictions of each juror and not a mere acquiescence in the conclusions of fellow jurors.

The judge did not inquire whether the majority stood for conviction or acquittal. In this context, the portion of the instruction suggesting that the minority re-examine their own views was not coercive, leaving properly to the jury the ultimate decision in the case; such an instruction is not inherently coercive, if the court is not informed of how the jury stands.

People v. Baumgartner, 166 Cal.App.2d 103, 332 P.2d 366, 370 (1958). *Baumgartner* recites the rule inherent in review of cases of this character: "an appellate court ought to direct reversal of a conviction when unable to say whether appellant would or would not have been convicted but for the trial court's errors." The entirety of the charge must be considered to determine whether, on appeal, this help should be entertained, even where the trial court may have erroneously conveyed a suggestion that the jury would be confined until a verdict was reached. Whittle v. State, 205 Ala. 638, 639, 89 So. 43, 48 (1921); Mallory v. State, 141 Ark. 496, 217 S.W. 482 (1920).

Notwithstanding the peremptory character attributed to the Allen charge as herein given, the jury took yet another three and one half to four hours of deliberation before reaching its verdict. The evidence against defendants was strong. It can hardly be said that honest reasonable doubts which some members of the jury may have entertained were readily yielded to a desire to obtain a discharge from service.