Filed 10/25/13  P. v. Perez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B240406 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA052889) |
| v. | |
| RYAN PEREZ and MELISSA ESCOBAR, | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Bernie C. LaForteza, Judge.  Affirmed as to Perez; reversed and remanded with directions as to Escobar.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Perez.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Escobar.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Stacy S. Schwartz, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendants Ryan Perez and Melissa Escobar appeal from the judgments entered following a jury trial in which they were convicted of first degree murder, with a finding Perez personally used a deadly and dangerous weapon. Escobar contends the trial court intruded upon the jury's deliberative process by interviewing individual jurors regarding potential misconduct and coerced the jury's verdict by means of its questions to jurors, inquiry as to whether the jury was divided only as to the degree of the murder, and its deadlocked jury instruction. Perez contends the trial court erred by denying his posttrial petition to disclose juror contact information. We affirm as to Perez, but we agree that the trial court coerced the verdict against Escobar, and thus reverse her conviction and remand the matter for a new trial.

## BACKGROUND

Because the errors on appeal pertain only to matters that occurred during jury deliberations+, we summarize only the most significant evidence presented at the lengthy trial.

On the evening of April 19, 2011 (undesignated date references pertain to 2011), Miguel Villa's body was found by a man on horseback in the desert in Lancaster. Bloody drag marks led from the body to the end of tire tracks, and two sets of footprints—one larger and the other smaller—accompanied the tire tracks and drag marks. Villa had suffered multiple blunt force injuries to the head, which caused his death. There were injuries to the forehead, left eye, cheek, and top of the head that could have been inflicted with either a fist or a blunt weapon, but an eight-inch area of lacerations and numerous intersecting fractures extending from the left ear to the back of the head would have required the use of a weapon, not just a bare hand. The deputy medical examiner identified at least nine or ten blows in the latter area and testified he would have expected more bleeding from Villa's wounds than the blood visible in photographs of the area in which Villa's body was found. A bruise on the back of Villa's right hand appeared to be a defensive wound.

2

Villa was identified through fingerprinting, and a search of Villa's residence and statements by his housemates led the police to Escobar, Villa's former girlfriend. Villa was partially paralyzed on his left side from an old gunshot wound to his neck. He limped and could not move his left arm.

Surveillance of Escobar's home by sheriff's deputies led to the identification of Perez, with whom Escobar commenced a tumultuous romantic relationship on December 31, 2010. On one occasion about two months before Villa's death, Perez answered Escobar's phone when Villa called. Perez called Villa "bitch" and told him not to call again. Later the same day, Escobar drove Perez to Villa's home in Highland, in San Bernardino County. Villa went out to Escobar's car and asked Perez if he still had a problem. Perez did not say anything or get out of the car. Villa told Perez to get out, then asked why they had come to his house if Perez was not going to do anything.

On the night of April 18, Escobar phoned Jose Medina, the father of her son Isaac, and asked him to pick up Isaac after he got off work. Medina agreed. When he arrived at Escobar's house late on April 18 or early on April 19, Perez and Escobar were there and seemed as if they were in a hurry to leave.

Sometime between 1:00 and 3:00 a.m. on April 19, one of Villa's housemates was entering the house at the same time Villa was leaving. Villa was speaking on a mobile phone in a relaxed manner, as if he were talking to someone he knew. Villa did not sound angry. The house door closed, then a car door closed, and a car drove away.

Detectives obtained call data records for the mobile phones of Escobar, Perez, and Villa, which revealed that two calls with blocked caller identification were made to Villa's phone using Perez's phone at 1:47 a.m. and 1:49 a.m. on April 19. The second of those calls lasted 14 minutes. Both calls began near Escobar's home, but the latter call ended near Villa's home.

Villa's phone was ultimately found atop a storage container in the rafters of Perez's garage. Perez denied any knowledge of the phone, but DNA found on the phone beneath its protective case was consistent with Perez, but not Escobar or Villa.

Blood producing a DNA profile that matched Villa's was found in the trunk and elsewhere in Escobar's car.

Investigators found silver-colored brass knuckles in Escobar's bedroom closet. Villa's housemate testified Escobar had once shown him two sets of brass knuckles in the center console of her car. One set was black and the other was the one in evidence. Investigators never found the black brass knuckles.

Escobar testified that she and Perez had argued April 17 and 18 and had temporarily broken off their relationship. They sent one another numerous angry text messages that were introduced in evidence at trial. Escobar had lunch with Villa on April 18 and they planned to go out that night if Escobar could find a baby-sitter. Medina agreed to pick up Isaac and arrived at the Escobar family home after midnight. Escobar denied that Perez was present and suggested Medina confused that night with other occasions when Perez was present. Escobar picked up Villa at his house and they drove to a nearby park so Villa could finish his beer. Then Escobar drove them to Forest Falls, where she parked at an isolated location she had visited many times with Perez and occasionally with Villa.

Escobar testified that she and Villa sat on the hood of her car, listening to the car stereo and talking. She was surprised to see Perez approaching them. She had not told Perez she was going out with Villa and had not seen Perez following her. Villa got off the hood, laughed, and began saying things to Perez. Perez and Villa argued. Villa took out and opened a folding knife, which he held by his side as he walked toward Perez. Perez stepped backward, but the two men continued to argue. Perez then hit Villa repeatedly with a metal baseball bat. Villa continued to move toward Perez with the knife, but dropped the knife at some point. Escobar picked up the knife and threw it in her car, but did not tell Perez. Perez continued to strike Villa's head, and Villa eventually fell to the ground. Perez dropped the bat and stepped away. Villa's head was split open, and Escobar was certain he was dead. She did not want to leave Villa's body there, so Perez put it in the trunk of her car before walking back to his own car.

4

Escobar and Perez drove away separately, but both pulled over part way down the hill. Escobar showed Perez Villa's knife. Perez took it from her and she never saw it again. Escobar followed Perez to his home, where they attempted to wash the blood off of Escobar's car. Perez then got into Escobar's car and Escobar began driving. She ended up in Lancaster, where they left the body. They then returned to Perez's house. Escobar did not do anything with Villa's phone, which had been in the center console of her car.

Perez did not testify or call any witnesses.

One of the investigating detectives testified in rebuttal that during their interviews neither Perez nor Escobar said that Villa had a knife or attacked Perez.

Escobar and Perez were tried together with a single jury, which convicted each of first degree murder. The jury also found that Perez had personally used a deadly or dangerous weapon in the commission of the offense. The court sentenced each defendant to a term of 25 years to life in prison for murder and added a one-year weapon-use enhancement to Perez's sentence.

## DISCUSSION

### 1. Escobar: court's intrusion upon jury's deliberative process and jury coercion

On the first day of jury deliberations, the jury appears to have deliberated for just an hour and three minutes.

On the second day of jury deliberations, the jury sent the court the following note: "What if we have a juror who believes a person is guilty of 1st degree murder but has a moral dilema [*sic*] assigning the label of 1st degree? The juror agrees with the law that requires the conviction but just doesn't want to use the label. Thanks!" The court did not address the question that day. The jury appears to have deliberated for a total of 3 hours 48 minutes that day.

On the third day of deliberations, the trial judge was apparently unavailable, so Judge Hayden Zacky conferred with counsel and, with their approval, sent the jury the following written response: "The court is in receipt of your question, which is attached.

5

[¶] As jurors, you have taken an oath to follow the law even if you personally disagree with it. If the prosecution has proved each element of the offense beyond a reasonable doubt, the jury must return a guilty verdict on that particular count and find the appropriate degree. Conversely, if the prosecution has not met its burden, the jury must return a not guilty verdict. [¶] Additionally, the jury is obligated to reach its verdict without regard to sympathy, prejudice or public opinion, and without regard to penalty or punishment. [¶] SEE JURY INSTRUCTIONS FOR FURTHER INFORMATION REGARDING THE ABOVE. [¶] Please advise the court if further clarification or assistance is required." The jury appears to have deliberated for a total of 4 hours 40 minutes that day.

On the fourth day of deliberations, the jury asked for a reading of a specified portion of Escobar's testimony. It then sent another note to the court: "Thursday [the second day of deliberations] afternoon we had a concern about personal beliefs & morals driving the decision rather than evidence. Today a juror stated they wanted to make 'a neutral decision.' We've asked for this juror to convince us based on evidence repeatedly & they haven't referred to the evidence. They've stated their opinion but it does not appear to be based on any evidence. Can you address the group? The instructions aren't helping. We have a decision for one defendant."

After the requested testimony had been read, the trial judge took the jury's verdict of first degree murder with personal use of a weapon against Perez. The verdict form stated it was signed by the foreperson, Juror No. 7, on February 16, 2012, which was the second day of deliberations. The court polled the jury, and each juror agreed it was his or her verdict. The court then asked the foreperson—outside the presence of the other jurors—whether any jurors were not deliberating. The foreperson replied, "I believe one of the jurors, their personal feelings are getting in the way and is not allowing them to look at the evidence or make a decision based only on the evidence solely." The court asked the foreperson whether it would be helpful to give an instruction similar to the one given by Judge Zacky. The foreperson said she believed it would be helpful. With the

6

consent of counsel for Escobar, the court then read Judge Zacky's written response to the jury's prior note, adding that the jury should reread CALCRIM No. 200 regarding the duties of the judge and the jury.

Later that day the jury sent another note: "We have a juror who will not follow the law because they do not agree with it. Can this juror be switched out? Can a juror request to be replaced?" The court conferred with counsel and declared its intention to inquire again of the foreperson to determine whether a juror was not deliberating. Escobar objected, arguing there appeared to be a mere disagreement among jurors and the foreperson was trying to oust a juror who disagreed with her. The court stated it was obliged to inquire and brought the foreperson into the courtroom. The foreperson told the court that one juror had "trouble with the sentence that will be given, not so much assigning a verdict." The court asked whether it was "an issue of first or second degree?" The foreperson agreed it was and explained, "Everybody feels it is, at minimum, second degree; but most people do believe that it is first." Escobar objected to further inquiry, saying the court was "delving into[,] getting into the deliberation process and having somebody to go back and tell somebody what to do with this situation. I think it really has been overdone." The court decided not to inquire further of the foreperson and to "take care of this tomorrow." It did not tell the foreperson not to communicate the content or nature of her discussion with the court to the other jurors.

It appears that the jury deliberated for a total of at least 4 hours 42 minutes on the fourth day, but the trial court's minute order does not reflect when the jury resumed deliberating after the court reporter read back certain testimony.

The next day, the court stated that after reviewing *People v. Williams* (1988) 45 Cal.3d 1268; *People v. Cleveland* (2001) 25 Cal.4th 466 (*Cleveland*); *People v. Engelman* (2002) 28 Cal.4th 436; and *People v. Leonard* (2007) 40 Cal.4th 1370 (*Leonard*), it felt it was required to determine whether any juror was not complying with his or her duties or was engaging in misconduct. Escobar objected to any further inquiry of any juror because there was merely a disagreement among jurors, as shown by the jury's ability to

7

reach a verdict as to Perez. Escobar asked the court to declare a mistrial on the grounds that the jury was hung and the foreperson and remaining jurors were committing misconduct by misapplying the reasonable doubt standard, that is, asking the holdout jurors to convince them that Escobar was not guilty. The court concluded it was required to inquire.

The court interviewed the jurors one at a time, outside the presence of the other jurors, starting with the foreperson. The foreperson revealed that her note pertained to Jurors No. 9 and 10. One of them, a man, was "having trouble following the law," and the other, a woman, was "having trouble living with the decision they're going to make." The foreperson clarified that the latter juror "would love to get out, if possible." The court subsequently determined that the male juror to whom the foreperson referred was Juror No. 10 and the female juror was Juror No. 9.

The court then individually questioned Jurors No. 1 through 6, followed by Jurors No. 8, 11 and 12, finishing with Jurors No. 9 and 10. In response to narrowly focused questioning by the court, each of these jurors identified Jurors No. 9 and 10 as the source of dissatisfaction. Jurors variously stated that Jurors No. 9 and 10 were not following the law; seemed to be unable or unwilling to follow the law; were incapable of understanding the law; could not make a decision; did not want to make a decision; were "being obstinate and switching opinion from one moment to the next"; refused to change their opinions or votes; had spoken of a moral problem, dilemma, or obligation; had said "[t]hey don't believe the evidence"; had stated their opinions in the form of "I feel"; and were allowing their emotions and their own past experiences to enter into their decisions. Juror No. 4 candidly told the court that neither Juror No. 9 nor Juror No. 10 had expressed unwillingness to follow the law or discussed sentencing or sympathy, but added, "I don't see any other reason why they would not just follow the law." Juror No. 5 reported that Jurors No. 9 and 10 "are adamant that they are following the law. [¶] But judging by their actions, in my opinion, they are in conflict with the law."

8

When the court inquired of Juror No. 9, it asked if she was "actually deliberating with the other jurors with regards to this case?  [¶]  In other words, are you looking at the facts and evidence?"  Juror No. 9 replied, "Yes.  Yes."  She further stated that she had read the law as given by the court and was following it, but she disagreed with her fellow jurors, who were bullying her because she saw things differently.  She said she was "tired of being bullied," could "barely sleep" at night, and wanted off the jury.  The court asked Juror No. 9 if she could "follow the law as I give it to you and do not let sympathy, prejudice, or public opinion influence you in any way . . . ."  She replied, "That's what I've been doing in there, and I'm just—I'm tired of being bullied by it.  They're telling me—"  The court interrupted:  "I don't want to get into your deliberation.  I understand.  I get where you're coming from.  [¶]  Have you—do you have any problem morally with applying the law to this case?"  Juror No. 9 replied, "No.  They keep on saying that to me."

The court then inquired of Juror No. 10:

The Court:  "All right.  I just wanted to know if you have any problems morally with the law that I've given you in this case."

Juror No. 10:  "No, your honor."

The Court:  "You don't?  [¶]  And in your opinion, do you feel that you're deliberating with the other jurors and will follow the law as I've given it to you without any regard to any bias, sympathy, prejudice, or any discussion of punishment with the other jurors?"

Juror No. 10:  "Yes, your honor."

The Court:  "And have you tried to keep an open mind and deliberate with the other jurors?"

Juror No. 10:  "Yes, your honor."

The Court:  "How would you respond if there was an allegation that you were morally opposed to the law in this case?  [¶]  Is that something that is inaccurate?

9

"Juror No. 10: Thank you, your honor, for giving me the opportunity. I—I was waiting for this time."

The Court: "Before you give me that, I do not want to talk about your deliberations, what you've been talking about. [¶] I want you to specifically talk about whether or not you have been morally opposed, if at all, to the law in this case."

Juror No. 10: "No, your honor. [¶] The first day we start, the first word that came—"

The Court: "I don't want to get into deliberations . [¶] Just tell me whether or not you feel you are able to—if you have a moral problem—"

Juror No. 10: "No. No. I said that. [¶] The defendant, they have to—"

The Court: "You're getting into deliberations. I do not want you to get into that. [¶] Do you have a moral problem with following the law?"

Juror No. 10: "No, your honor."

The Court: "Have you let any—the fact of punishment or sympathy towards any of the defendants in this case bear on your decision or your deliberations?"

Juror No. 10: "No, your honor."

The Court: "It is not—you've not let sympathy or any prejudice on either side or sympathy for either side come into your—in your mind as to how you deliberate in this case?"

Juror No. 10: "No, your honor."

The Court: "Do you feel you've been engaging or talking with the other deliberating jurors and talking about this case and talking about the law and talking about the facts in this case and the evidence?"

Juror No. 10: "Yes."

The Court: "Do you have any problems with the other jurors in terms of your interaction with them?"

Juror No. 10: "Yes."

The Court: "Without talking about your deliberation process, can you tell me what seems to be the problem?"

Juror No. 10: "The problem is that no matter—the problem is they have the mindset for a guilty—"

The Court: "We're getting into the—do you feel like you've—that you're actually deliberating with the other jurors? [¶] Are you, in a way, being forced not to talk? [¶] Or is your opinion being drowned out in any way because you—that is what I'm getting into. [¶] I'm not getting into the specifics of the deliberation, how you're interacting with the other jurors and whether or not you're applying the law in this case."

Juror No. 10: "I feel like I interact with respect and—"

The Court: "You've read the jury instructions that I've given you, that packet?"

Juror No. 10: "Yes."

The Court: "Each and every one of them that even discusses the fact you're not to consider sympathy or punishment in this case?"

Juror No. 10: "No."

The Court: "You've not read that?"

Juror No. 10: " Consider sympathy?"

The Court: "Right."

Juror No. 10: "No. No. [¶] I have to base on the evidence and—"

The Court: "And the law."

Juror No. 10: "Yes."

The Court: "All right. If I ask you to go in to deliberate with the other jurors, you'll follow the law, and you'll not let sympathy or punishment come in in any way into our deliberation? [¶] You won't let bias, sympathy, prejudice or either side come into play in any way?"

Juror No. 10: "No."

After the hearing, the prosecutor stated that he would not seek discharge of either Juror No. 9 or Juror No. 10 because no misconduct had been shown. Escobar renewed

11

her motion for a mistrial, which the trial court denied. The court returned the entire jury to the courtroom and stated, "I inquired yesterday about what was the possible hang-up. I believe I inquired, and your [the foreperson's] answer—your answer was it was as to degree, either first or second. Is that currently the issue at this point?" The foreperson replied, "Yes. We were much closer to a decision until a verdict was read." The court recessed for lunch. After the recess, the court stated its intent to further instruct the jury using the instruction given in *People v. Whaley* (2007) 152 Cal.App.4th 968, 975–977 (*Whaley*), and *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118–1120 (*Moore*). Escobar did not object to the proposed instruction, but requested a modification, which the court adopted over the prosecutor's objection.

The court's lengthy instruction began as follows: "It has been my experience on more than one occasion that a jury which initially reported that it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it. [¶] To assist you in your further deliberations, I'm going to further instruct you as follows: [¶] Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard to the consequences of your verdict, regardless of how long it takes to do so. [¶] It is your duty, as jurors, to carefully consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors. [¶] In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. [¶] You should not hesitate to change your view once you've held it if you are convinced it is wrong or to suggest to other jurors to change their views if you are convinced they are wrong. [¶] Fair and effective deliberations require a frank and forthright exchange of views. [¶] As I previously instructed each of you—[¶] Strike that. [¶] I urge you to follow your individual judgment in that regard. [¶] As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all the evidence with your fellow jurors. [¶] It is your duty, as

12

jurors, to deliberate with a goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.  [¶]  Both the People and defendant are entitled to the individual judgment of each juror.  I urge you to follow your individual judgment in that regard.  [¶]  If there is anything that this court can do to assist you in performing your duties, please do not hesitate to let me know.  [¶]  At your request, you can be provided with read-back of testimony, further explanation of the legal concepts, further instructions, or even further argument by the attorneys on any point, on any topic that you may request."

The court's instruction continued:  "As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.  [¶]  May I suggest that since you have not been able to arrive at a verdict using the methods that you've chosen, that you consider changing the methods you've been using or following at least temporarily and try new methods.  [¶]  For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa.  This might enable you to better understand the other's position.  [¶]  By suggesting you consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations.  I merely find you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.  [¶]  I also suggest you reread CALCRIM instruction 200 and instruction 3550.  These instructions pertain to your duties as jurors to make recommendations in how you should deliberate.  [¶]  The integrity of the trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions.  [¶]  The decision the jury renders must be based on the facts and on the law.  You must determine what facts have been proved from the evidence received in the trial, not from any other source.  [¶]  A fact is something proved by the evidence or by stipulation.  [¶]  . . .  [¶]  Second, you must apply the law as I state it to you

13

to the facts as you determine them and, in this way, arrive at your verdict. [¶] You must accept and follow the law as I state it to you regardless of whether you agree with the law. [¶] If anything concerning the law said by the attorneys in their arguments or any other time during the trial conflicts with my instructions on the law, you must follow my instructions. [¶] Instruction 3550 defines the jury's duty to deliberate. [¶] The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict. [¶] You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments, and suggestions that I have made and the instructions now presented to you. [¶] I hope my comments and suggestions may have some assistance to you. [¶] You are ordered to continue your deliberations at this time. [¶] If you have other questions, concerns, or requests or other communications you desire to report to me, please put them in writing on the form the bailiff has provided you with. Have them signed and dated by the foreperson and please notify the bailiff."

The jury resumed deliberating and three minutes later sent the court a note requesting a CD player or computer to play a CD. Thirty minutes later, without receiving a CD player or computer, the jury returned its first degree murder verdict against Escobar.[1] The jury was polled and every juror, including Jurors No. 9 and 10, stated it was his or her verdict.

Escobar challenges the court's decision to "disturb[] the deliberative process by conducting individual interviews of the jurors when the evidence before it showed only, as trial counsel argued, a legitimate disagreement among the jurors and not misconduct."

---

[1] The reporter's transcript indicates the verdict was returned seven minutes after the jury resumed deliberations. The clerk's minute order indicates the jury "buzz[ed] with a verdict" 33 minutes after resuming deliberation. Before it took the verdict, the court stated that the jury returned its verdict "approximately 30 minutes after" sending the note

She contends the "trial court's interference with the jury" violated her rights to due process and a jury trial by pressuring Jurors No. 9 and 10 into voting with the majority. Perez's opening brief includes a conclusory joinder in this issue, but he has not attempted to explain how he was prejudiced by actions undertaken by the court the day after the jury had rendered its verdict as to Perez. We conclude the issue is inapplicable to Perez.

We asked the parties to file letter briefs addressing the issue of jury coercion based upon matters such as the trial court's inquiries whether the jury was merely divided over the degree of the offense and the responses thereto, the trial court's questions and statements to the holdout jurors during its individual inquiries, and the trial court's statements and instructions to the jury after learning that the jury was divided over the degree of the offense. Escobar argued in her letter brief that the trial court's questions to all of the jurors, its inquiries whether the jury was divided over the degree of the offense, and its deadlocked jury instruction coerced the verdict against her. The Attorney General argued in her letter brief that neither the court's supplemental instructions nor its examination of the jurors was coercive.

### a. Propriety of conducting an inquiry

The decision whether to investigate the possibility of juror bias, incompetence, or misconduct rests within the trial court's discretion. (*Cleveland*, *supra*, 25 Cal.4th at p. 478.) But when a trial court is on notice that good cause to discharge a juror may exist, it must "'"'make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged."'" (*People v. Martinez* (2010) 47 Cal.4th 911, 941.) Failure to conduct an adequate inquiry constitutes error. (*People v. Farnam* (2002) 28 Cal.4th 107, 141.)

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the

about a CD player or computer. The court asked if the jury still wanted to "hear that CD." The foreperson said, "We would like to go forward with the verdict."

15

sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

Although it is clear in hindsight that the stumbling block during deliberations was a difference of opinion between the majority and the holdout jurors, we cannot conclude that this was apparent from the jury's notes to the court and the foreperson's responses during the trial court's inquiries regarding the notes. The notes and responses placed the court on notice that good cause to discharge a juror for misconduct may have existed, in that the court had been told that a juror seemed to be ignoring the evidence and deciding the case on the basis of sentiment, a juror "will not follow the law because they do not agree with it," and a juror was considering the potential sentence in determining the degree of the crime, all of which were violations of jurors' duties and the court's instructions to the jury.

Accordingly, we can conclude neither that the trial court abused its discretion by conducting its inquiry of individual jurors nor that the mere existence of the court's inquiry was coercive. The court's inquiries of each juror occupy approximately the same number of pages in the reporter's transcript, and thus appear to be have been of similar duration. Although it probably would have been more prudent for the court to either interview jurors in random order or adhere to strict numerical order instead of interviewing Jurors No. 9 and 10 last, it was clear from the statements Jurors No. 9 and 10 made to the court that they knew they were the subject of other jurors' complaints. Escobar's contention that the order in which the court interviewed jurors coerced these holdout jurors into submitting to the majority is purely speculative.

### b. Jury coercion

Where a jury has been unable to reach agreement, in order to discharge its statutory responsibility to assure that a verdict is rendered unless "'it satisfactorily appears that there is no reasonable probability that the jury can agree,'" a trial court "may inquire of the jury as to its numerical division without seeking to discover how many jurors are for conviction and how many are for acquittal."  (*People v. Carter* (1968) 68 Cal.2d 810, 815 (*Carter*), abrogated on another ground in *People v. Gainer* (1977) 19 Cal.3d 835, 851.)  But "[t]he division of the jury in terms of votes for conviction and acquittal has no bearing upon the question of reasonable probability of agreement and therefore is of no concern to the court."  (*Carter*, 68 Cal.2d at p. 815, fn. 3.)  More important, "There is always a *potential* for coercion once the trial judge has learned that a unanimous judgment of conviction is being hampered" by one or more holdout jurors.  (*People v. Sheldon* (1989) 48 Cal.3d 935, 959 (*Sheldon*).)  Once a court learns how the jury stands, it has a duty to exercise greater caution in its remarks to the jury to prevent jurors from concluding that the court is urging, or even suggesting, a verdict one way or the other.  (*People v. Walker* (1949) 93 Cal.App.2d 818, 825 (*Walker*).)  "[I]f, under the circumstances of the particular case, the remarks of the judge, who knew how the jury stood, were such as to bring to bear in some serious degree, although not measurable, an improper influence upon the jury, or to indicate to the jury that a particular result should be reached, such remarks constitute prejudicial error."  (*Ibid.*)

The existence of coercion necessarily depends upon the facts of each case (*People v. Sandoval* (1992) 4 Cal.4th 155, 196), but "[m]ost cases wherein adjuratory remarks of the court have been held coercive are those in which the court, either through its own questioning or through volunteered statements of jurors, has become informed not only as to the numerical division of the jury but also as to how many stand on each side of the ultimate issue of guilt.  . . .  The urging of agreement in such circumstances of course creates in the jury the impression that the court, which has also heard the testimony in the case, agrees with the majority of jurors.  Coercion of the jurors in the minority clearly

17

results." (*Carter*, *supra*, 68 Cal.2d at p. 816.) "The basic question . . . is whether the remarks of the court, viewed in the totality of applicable circumstances, operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency. Such a displacement may be the result of statements by the court constituting undue pressure upon the jury to reach a verdict, whatever its nature, rather than no verdict at all." (*Id.* at p. 817.) Of necessity, this assessment considers whether jurors voting in the minority would have viewed the court's remarks and conduct as exerting pressure upon them to conform their opinion to that of the majority (*id.* at p. 819; *Walker*, *supra*, 93 Cal.App.2d at p. 825; *People v. Baumgartner* (1958) 166 Cal.App.2d 103, 108 (*Baumgartner*), disapproved on another ground in *People v. Gainer*, *supra*, 19 Cal.3d at p. 852, fn. 17), or as expressing a view that the jury should convict the defendant (*People v. Blackwell* (1927) 81 Cal.App. 417, 421 (*Blackwell*)).

In *Walker*, *supra*, 93 Cal.App.2d 818, the court inadvertently learned that the jury was deadlocked "'ten to two for conviction.'" (*Id.* at p. 820.) In response to the court's inquiry, ten jurors opined that there was no chance jurors would reach a verdict, while two jurors opined that there was such a chance. The court then told the jury that although it did not want to inconvenience anyone, "'I have a heavy sense of my responsibility to the taxpayers, and to the public of the County, and a trial like this is an expensive thing, and a hung jury means it all has to be gone over again before another jury, and that means double expense to the County,—to the taxpayers. If there is not any chance of your agreeing, of course, I haven't anything else to do,—it would be foolish for me to keep you and lock you up, which I would not do, of course.'" (*Id.* at p. 821.) The court then directed the jury to "'go back to the jury room and take half an hour and see if you can't reach an agreement. Talk it over fairly; I don't want anybody to do violence to his own judgment, *but at the same time there are twelve of you,—and ten one way and two the other—that is coming pretty close to an agreement.*'" (*Ibid.*) The appellate court reversed, stating, "[I]t is clear from a reading of the judge's remarks in our case that the two jurors voting for acquittal (and who apparently had consistently so voted from the

18

beginning), well could have believed that the judge felt they should agree with the majority. Undoubtedly, the judge did not intend to influence the jury as to the type of verdict to be rendered, but we must realistically consider the effect of the language used. There was no impropriety in his asking how the jury stood numerically, but the moment he gained the information concerning which way they stood, it was his duty to be more than careful in his remarks thereafter, so that the jury would clearly understand that he was not urging, or even suggesting a verdict one way or the other. Instead he said, 'there are twelve of you,— and ten one way and two the other,—that is coming pretty close to an agreement.' It was close to an agreement *only* if the two for acquittal would change their view and join the majority. As said in *People v. Kindleberger* [(1893)] (100 Cal. 367, 369) [court told hung jury, 'in view of the testimony in this case, the court is utterly at a loss to know why twelve honest men cannot agree in this case'], '[T]he remarks of the judge in this case could not fail to create the impression that he thought the jury ought to convict upon the evidence before them.'" (*Walker*, *supra*, 93 Cal.App.2d at p. 825.)

In *Baumgartner*, *supra*, 166 Cal.App.2d 103, the foreperson responded to the court's inquiry regarding numerical division by revealing that the jury stood at 11 to 1 for conviction. The court then gave the jury an *Allen*-type instruction (see *Allen v. United States* (1896) 164 U.S. 492 [17 S.Ct. 154]), which included the following language: "'[I]n conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women, equally honest, equally intelligent with himself or herself, and who have heard the same evidence with the same attention with an equal desire to arrive at the truth, and under the sanction of the same oath.'" (*Baumgartner*, at p. 106.) The appellate court concluded that, given the revelation by the foreperson that the jury stood 11 to 1 for conviction, "These admonitions must have appeared to the holdout juror, and to the others for that matter, to

19

have been leveled at him.  There was an implication that in achieving that holdout status the recalcitrant juror had not paid proper respect to the opinions of the others, had not listened to their arguments with a disposition to be convinced, and that he ought to have done so.  Under the circumstances, the 11 might well have returned to the jury room, not minded to reason further with, but to attack, the recalcitrant one."  (*Id.* at p. 108.)

In *People v. Talkington* (1935) 8 Cal.App.2d 75, disapproved on another ground in *People v. Friend* (1958) 50 Cal.2d 570, 578, the trial court's initial inquiry was essentially identical to that of the trial court in the present case.  After learning that the jury was divided nine to three, the court asked, "'A difference over the degree of crime, probably?'"  The foreperson agreed it was.  The court stated that it would "'stick around'" for another 50 minutes and had "'made provisions for the remainder of the night,'" and directed the jury to continue deliberating for a "'while longer.'"  (*Talkington*, at p. 79.)  Fifteen minutes later, the jury returned to the courtroom and the foreperson informed the court that a specified juror did not understand what the court meant by "'the degree of crime.'"  The court then asked, "'[H]ave you all agreed on the guilt of the defendant?'"  The foreperson said they had not.  The court asked, "'Some of them are for not guilty?'"  The foreperson replied, "'Three of them for not guilty and nine for guilty.'"  (*Id.* at pp. 79–80.)  The court responded by informing the jury that it believed and agreed with the prosecutor's argument and added, "'I cannot see how anyone can, after hearing this evidence, can raise a very strong argument, or make an argument in defense, that is, to the extent that there is no crime committed here.'"  The court disparaged the defense theory, pointed out inconsistencies in the defendant's testimony, and stated, "'all of those things lead very strongly that she deliberately committed this act.'"  The court concluded its remarks by saying, "'I have tried a great many cases, and this is as clear as any case tried in this courtroom.'"  A juror volunteered that he or she thought the jury could come to an agreement, and the court responded, "'Well, if it can be reached within the next two hours—well, as far as that is concerned you are not going to get away from here for some time; you need not worry about that at all; you need not talk about that if you don't agree;

20

as far as talking to me about getting away, forget it; just retire.'" (*Id.* at p. 80.) The appellate court concluded that the trial court's remarks to the jury after learning how the jury was divided "necessarily tended to coerce the jury" and constituted prejudicial error. (*Id.* at pp. 88, 90.)

In *Blackwell*, *supra*, 81 Cal.App. 417, the foreperson volunteered the information that the jury was divided nine to three for conviction. The trial court asked what the difficulty was, and the foreperson said, "'Certain of the jurors give credit to the witnesses for one side, and the rest give credit to the witnesses for the other side, and there seems to be very little chance of reconciling the views of the different members.'" The court asked if any jurors wanted the evidence read, and the foreperson replied, "'No, there doesn't seem to be any question as to the evidence, although some members of the jury refuse to believe certain witnesses.'" The court responded, "'You have heard the evidence here and you all understand all of the evidence. I think the jury ought to agree on a verdict. I think you better retire and deliberate further.'" (*Id.* at pp. 420–421.) The appellate court concluded, "Under all the circumstances, there is merit in appellant's contention that the statement of the court, 'I think the jury ought to agree on a verdict,' amounted to 'a plain intimation that the court thought the evidence in the case warranted a verdict of guilty and that the jury should so find.' The foreman had just announced that the jury stood nine to three for conviction and that some of the jurors 'refused to believe certain witnesses.' The defendant was the only witness for the defense who gave testimony in denial of his participation in the alleged offense. Three witnesses for the prosecution testified to the defendant's connection with the offense. From the foreman's statement that 'some members of the jury refuse to believe certain witnesses,' the natural inference is that the three jurors voting for acquittal refused to believe the witnesses for the prosecution rather than that the nine others refused to believe the defendant's testimony. As was said in *People v. Kindleberger*, [*supra*,] 100 Cal. 367, 369, 'We think the jury understood, or at least may have understood, from these unguarded remarks that in the opinion of the judge the defendant was guilty.' And as said in *People v. Conboy* [(1910)] 15 Cal. App. 97, 98,

21

'These remarks amounted to a plain intimation that the court thought the evidence in the case warranted a verdict of guilty, and that the jury should so find.'" (*Blackwell*, at p. 421.)

Carter, *supra*, 68 Cal.2d 810, concerned remarks by a judge who had not presided over the trial and had learned only that the jury was divided 11 to 1. (*Id.* at p. 813 & fn. 1.)  The Supreme Court nonetheless concluded that the conduct and remarks of the judge were coercive. (*Id.* at p. 820.)  After stating the jury's numerical division, the foreperson pointed out two jury instructions and stated that "'one of the jurors'" would like an interpretation or elaboration of these instructions.  The judge reread to the jury instructions regarding the presumption of innocence and requirement of proof to a moral certainty, then asked whether that helped.  The foreperson suggested that "'*the juror who is in doubt* here, maybe he could ask you that question.'"  The judge said, "'Well, *let me ask the juror if he understands the two instructions now?*'"  A juror then responded that he understood the instructions but was "'confused as to the precise definition of moral evidence.'"  The judge defined "'[m]oral evidence,'" then asked jurors who thought there was no chance the jury would reach a verdict to raise their hands.  The foreperson asked for "'[t]wo or three hours,'" and the judge responded, "'*No, sir, I'm not going to stay up here two or three more hours, that I'll tell you.*'"  After learning from the prosecutor that the trial had been short, the judge stated, "'Certainly it wasn't a long and complicated case, that's for certain.'"  The judge then told jurors, "'*I'm going to send you out again and I'm going to stay here a half hour.  I'd hate to lock you up tonight.*'" (*Id.* at pp. 813–814, fn. 1.)  The jury returned a guilty verdict 10 minutes later. (*Id.* at p. 814.)  In concluding the judge coerced the verdict, the Supreme Court cited the judge's conduct of singling out the dissenting juror and questioning him regarding his understanding of certain instructions; the judge's request for a show of hands regarding jurors' opinions as to the probability of reaching a verdict; the judge's comment that the case was not complicated; and the judge's response to the foreperson's suggestion that the jury deliberate a further two or three hours, particularly "the exasperated and peremptory tone"

22

and the "stern admonition, couched almost in terms of a threat, that the jurors would be locked up for the night if a verdict were not reached within a half hour." (*Id.* at pp. 819–820.) The Supreme Court characterized the effect of the judge's conduct as "exert[ing] extreme pressure upon the lone dissenting juror to conform his opinion to that of his fellow jurors." (*Id.* at p. 819.)

In contrast, the Supreme Court has held in several capital cases that the trial court did not coerce a penalty verdict of death after inadvertently learning that the jury was divided 11 to 1 for death. (*People v. Pride* (1992) 3 Cal.4th 195, 264–266 [trial court merely asked jury to continue deliberating, but did not further instruct]; *Sheldon*, *supra*, 48 Cal.3d at pp. 958–960 [trial court reread previously given instructions, including one telling jurors not to "'be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision,'" then asked jury to continue deliberating]; *People v. Keenan* (1988) 46 Cal.3d 478, 528–533 [after initial note trial court gave instructions, including "'each of you must decide the case for yourself and not merely acquiesce in the conclusions of your fellow jurors'" and "'I am not suggesting to any of you that you surrender your honest convictions as to what the evidence in this case has disclosed and of the weight and effect of the evidence'"; after second note court told jury it appeared from foreperson's note jury had problem that court would question jurors about Monday and asked each juror over weekend to examine conscience and recall oath and duty to follow law; problem resolved over weekend].) Similarly, in *People v. Bell* (2007) 40 Cal.4th 582, the Supreme Court found no coercion where the trial court had learned inadvertently that the jury was divided 11 to 1 in favor of a true finding on a robbery-murder special circumstance, but declined to declare a mistrial and instead asked the jury to continue deliberating, saying the jury had not deliberated long enough to discuss the case fully and understand each other's viewpoint fully. (*Id.* at pp. 613, 617.)

In *Moore*, *supra*, 96 Cal.App.4th 1105, and *Whaley*, *supra*, 152 Cal.App.4th 968, from which the trial court in this case derived its deadlocked jury instruction, the trial courts did not know how the jury was voting, merely that it was deadlocked as to one

count (*Moore*, at p. 1118) or divided 11 to 1 (*Whaley*, at pp. 973–974). In these cases, the trial courts simply gave the additional instruction and asked the jury to continue deliberating. (*Moore*, at pp. 1118–1120; *Whaley*, at pp. 974–978.) In each case, the appellate court rejected a claim that the trial court had coerced the verdict by giving the instruction and asking the jury to continue to deliberate. (*Moore*, pp. 1120–1121; *Whaley*, at p. 983.)

Viewed from the perspective of Juror No. 10, the conduct and statements of the trial court in this case present several of the coercive factors found in the cases summarized herein. The court created a significant potential for coercion by twice inquiring whether the disagreement among jurors that was preventing them from reaching a verdict was the degree of the offense. (*Sheldon*, *supra*, 48 Cal.3d at p. 959; *Carter*, *supra*, 68 Cal.2d at p. 816; *Walker*, *supra*, 93 Cal.App.2d at p. 825.) The first time the court made this inquiry the only juror present was the foreperson, but the court did not warn the foreperson not to inform the other jurors of what she had discussed with the court. The court later repeated the same inquiry in the presence of the entire jury after it had completed its inquiry of Juror No. 10.

In conducting its inquiry of Juror No. 10, the court repeatedly asked him the same questions, notwithstanding Juror No. 10's answers indicating he was not refusing to deliberate or to follow the law and was not allowing sympathy, potential punishment, or other improper factors to influence his opinion. The court asked Juror No. 10 whether he was morally opposed to the law or not following the law four times, including its query, "You don't?" immediately following Juror No. 10's first denial that he was morally opposed to the law set forth in the jury instructions. Indeed, the court asked Juror No. 10 that question three times in a row, and each time Juror No. 10 replied that he was not. The court asked Juror No. 10 whether he was deliberating with other jurors three times, even though Juror No. 10 responded each time by saying that he was deliberating with other jurors. The court asked Juror No. 10 five times—including twice in direct succession—if he was reaching his opinion without bias or prejudice and without

24

considering sympathy, potential punishment, or other improper factors, and each time Juror No. 10 told the court he was not considering such factors. Although we cannot ascertain from the printed page of the reporter's transcript the court's tone or demeanor during this questioning, we conclude Juror No. 10 would reasonably have understood from the court's excessive repetition of the same few questions that Juror No. 10 repeatedly answered that the court did not believe his responses and instead believed that Juror No. 10 was not following the law because he morally opposed it, was not deliberating, and was biased or prejudiced or considering sympathy or potential punishment in violation of the jury instructions. In short, holdout Juror No. 10's perspective likely would have been that, based upon statements by the foreperson and other jurors, the court believed he had engaged in misconduct during deliberations and his own denials of such misconduct had failed to persuade the court. Because it was Juror No. 10's holdout status that had led his fellow jurors to make such reports and the court to, effectively, accuse him of misconduct, the content of the court's inquiries singled out Juror No. 10 and he would have viewed the court's remarks and conduct as exerting tremendous pressure upon him to abandon his views of the case and conform to the views of the majority.

After the court questioned Juror No. 10 and made the entire jury aware—if it had not previously been aware—that the court knew the jury was divided over the degree of the murder, the court gave the *Moore-Whaley* deadlocked jury instruction. Although the instruction is not inherently objectionable in general, it did nothing to alleviate the appearance of the coercive nature of the trial court's questioning of Juror No. 10. No aspect of the instruction advised jurors that they should not surrender their opinions to acquiesce in the opinions of other jurors, reach a verdict, or avoid being accused of misconduct. In addition, against the backdrop of the court's questioning of Juror No. 10 and the jury's awareness that the trial court knew how the jury was voting, the instruction "must have appeared to the hold-out juror, and to the others for that matter, to have been leveled at him." (*Baumgartner*, *supra*, 166 Cal.App.2d at p. 108.) Juror No. 10 would

25

have reasonably concluded that the court believed he was morally opposed to, and not following, the law given the jury by the court. The court's deadlocked jury instruction repeatedly told jurors they must follow and apply the law given by the court in the jury instructions: "[Y]ou must apply the law as I state it to you to the facts as you determine them," "You must accept and follow the law as I state it to you regardless of whether you agree with the law," "If anything concerning the law said by the attorneys in their arguments or any other time during the trial conflicts with my instructions on the law, you must follow my instructions," and "The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the court." Although the jury was, of course, required to apply the law it received in the jury instructions, the court's many repetitions of this principle soon after the court's six inquiries about whether Juror No. 10 was opposed to the law or not following it would have appeared to Juror No. 10 to have been directed at him.

In addition, the deadlocked jury instruction may well have increased the coercive pressure on Juror No. 10 to join the majority by urging jurors not to "hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs," "suggest to other jurors to change their views if you are convinced they are wrong," and adopt different deliberation strategies to attempt to convince jurors with opposing views. While these provisions could be viewed as relatively evenhanded and unobjectionable in the usual case, they could well be viewed by a holdout juror who had been singled out and placed under pressure by the trial court as being directed at him and implying he should reexamine his views and that jurors in the majority should feel free to tell him he was wrong and adopt different methods to convince him. We do not believe the several references in the deadlocked jury instruction to "individual judgment" and the single reference to "decide the case for yourself" would have been sufficient to dispel the coercive potential of other portions of the instruction in the circumstances of this case.

We consider it significant that the jury returned its verdict of first degree murder 33 minutes after the court delivered its deadlocked jury instruction, which directly

26

followed the coercive inquiry of Juror No. 10 and the court asking, in the jury's presence, whether the jury was still divided regarding the degree of the crime. The jury had deliberated for at least 14 hours 13 minutes over the course of four days before the three coercive events occurred on the fifth day of deliberations, but the holdouts, Jurors No. 9 and 10, quickly changed their views and joined the majority after those events.

Given all of the circumstances of this case, we conclude that Juror No. 10 would reasonably have viewed the court's words and conduct as exerting extreme pressure upon him to conform his opinion to that of the majority (*Carter*, *supra*, 68 Cal.2d at p. 819), Juror No. 10 "well could have believed that the judge felt [he] should agree with the majority" (*Walker*, *supra*, 93 Cal.App.2d at p. 825), created "in the jury the impression that the court, which has also heard the testimony in the case, agrees with the majority of jurors" (*Carter*, at p. 816), and "operate[d] to displace the independent judgment of the jury in favor of considerations of compromise and expediency" (*id.* at p. 817). In other words, the trial court coerced the verdict as to Escobar. This constitutes reversible error. (*Id.* at pp. 820–821; *Walker*, *supra*, 93 Cal.App.2d at pp. 825–826; *Baumgartner*, *supra*, 166 Cal.App.2d at pp. 108–109.)

## 2. Perez and Escobar: Denial of petition to reveal juror contact information

Before the sentencing hearing, Escobar filed a "Petition for Order Disclosing Juror Information" pertaining to the jurors who rendered a verdict. Counsel's declaration attached to the petition stated the following: "After the verdict jurors number nine (9) and ten (10) spoke with me in the parking lot of the court house. . . . [T]he jurors appeared to want to speak with me (I had already left the courthouse and was about thirty (30) miles away when I discovered from defendant's family that there were jurors in the parking lot who wanted to talk with me). [¶] Juror number 9 informed me that: [¶] A) the 'rest of the jurors' would deliberate without me because I did not agree with them.' [¶] B) 'the pressure from the other jurors to agree with them was so intense that [she] couldn't sleep at night and was having nightmares about the whole experience.' '[She] would rather be hit by a car then [*sic*] go through that kind of pressure again.' [¶] C)

27

'Juror number ten [11] [*sic*] immediately stated that [the jury] should hang em' at the very beginning of deliberations without the jury having even picked a foreperson' '[juror 11] continue[d] to state that [the jury] should hang em' throughout the very early part of jury deliberation. [¶] D) '[she] stopped deliberating herself after the decision on codefendant because she could not tolerate the belittling of her by juror number seven (7)' [¶] E) 'Other jurors called me stupid and uneducated because I didn't agree with them.' [¶] Juror number ten (10) informed me that: [¶] A) he was told 'That he should renounce his citizenship if he did not agree with [the rest of the jury] [¶] B) '[He] was a witness to the bullying of juror number 9 by the other jurors.' [¶] 4. Jurors nine (9) and ten (10) both simultaneously decided to convict immediately within fifteen minutes of the Court's final instruction to continue deliberating on the fifth day of deliberations. [¶] 5. Jurors nine (9) and ten (10) informed me that they wanted to talk to me in the future (I had to leave but the jurors appeared to want to continue to talk in the parking lot). I gave the jurors my card and asked if they would write declarations based on our conversation. They agreed and informed me that they would call me. As of today's date I have not heard from either of the jurors but I believe that they would be willing to write the declarations and/or sign affidavits to the same (Juror number nine (9) said she does not want to come to Court)."

At the hearing on the petition Perez joined in the request for disclosure. Counsel for Escobar explained that Jurors No. 9 and 10 waited more than an hour for him in the parking lot, "were crying," and "had a lot to say." He argued that his declaration demonstrated juror misconduct, in that other jurors deliberated without Juror No. 9 and Juror No. 9 later stopped deliberating. Counsel for Escobar stated that he included in his declaration the statements of Jurors No. 9 and 10 regarding what other jurors said to them "not to show that that in itself constitutes jury misconduct, but it goes to the validity of their statements about why they separated themselves."

The trial court denied the petition, citing four reasons: (1) the declaration by Escobar's attorney failed to make a prima facie showing of good cause, as required by

28

Code of Civil Procedure, section 237, subdivision (b), because it was "based on hearsay and not on personal knowledge"; (2) the responses of jurors during the court's inquiry revealed a disagreement, not jury misconduct; (3) the court provided additional instruction to jurors regarding their duties and the court "ha[d] to assume that they understood and followed this instruction"; and (4) jurors were polled after the verdict against Escobar was read, and the court could "only assume" that Jurors No. 9 and 10 were being honest in saying it was their verdict.

Perez contends that the trial court erred by denying the petition to disclose juror contact information. Notably, he argues the misconduct was the "harassment and intimidation" of Jurors No. 9 and 10 by the remaining jurors, not Juror No. 9's refusal to deliberate or the deliberation of other jurors without Juror No. 9. Perez also asserts in passing that the reported "'hang em'" statement by Juror No. 11 was misconduct. Escobar's opening brief includes a conclusory joinder in this issue, which appears equally applicable to her.

We review the trial court's ruling on the petition for disclosure for abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.) Pursuant to Code of Civil Procedure section 237, subdivision (b), defendants were required to show good cause for disclosure of the jurors' identifying information. Good cause requires showing both facts sufficient to support a reasonable belief that jury misconduct occurred and diligent efforts to contact jurors through other means. (*Jones*, at p. 317; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)

Without addressing the trial court's evidentiary concerns, we agree that the declaration of Escobar's attorney failed to make a prima facie showing sufficient to support a reasonable belief that jury misconduct occurred. The strongest bases for the misconduct allegation were those relied upon by Escobar in the trial court: Juror No. 9's statement that the remaining jurors deliberated without her and she stopped deliberating after the verdict on Perez. The latter statement was expressly contradicted by Juror No. 9's statement to the court during its inquiry that she was actually deliberating with the

29

other jurors. The statement was also implicitly contradicted by paragraph 4 of counsel's declaration, in which he related that Jurors No. 9 and 10 "decided to convict" Escobar within 15 minutes of the court's final instruction, as well as Juror No. 9's response when the jury was polled. Thus, as Perez argues in his reply brief, it appears that Juror No. 9 "almost certainly meant that she had stopped deliberating for a period of time before assenting to a verdict, not that she never resumed deliberations." While a temporary refusal to deliberate would be misconduct, it cannot be assumed to have been prejudicial where the juror later resumed deliberations. A trial court's duty to conduct a posttrial hearing arises only where a defendant produces evidence demonstrating a strong possibility of *prejudicial* misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.)

Faced with a more egregious instance of a juror's refusal to deliberate in *Leonard*, *supra*, 40 Cal.4th at pages 1410–1412, the California Supreme Court concluded that a juror who expressed a fixed conclusion at the beginning of deliberations, then sat in a corner of the jury room reading a book, committed harmless misconduct. The court noted that nothing indicated that the juror who refused to deliberate was biased or that he prejudged the case; "rather, Juror No. 8 apparently concluded, based on the evidence presented at trial, that the evidence of defendant's guilt was so overwhelming that there was nothing left to discuss." (*Id.* at p. 1412.) The court explained that because the juror who refused to deliberate and the other 11 jurors, "considering the case separately, unanimously reached the same conclusion (that defendant was guilty), the inference is inescapable that they would have reached the same conclusion if they had discussed the case together. Thus, the failure of the two [groups] to discuss the case with each other was harmless." (*Id.* at p. 1411.) Similarly, if Juror No. 9 temporarily stopped deliberating, but later resumed deliberating and reached a verdict, her temporary refusal to deliberate appears to have been harmless.

Juror No. 9's statement that other jurors "would deliberate without" her also appeared to reflect, at most, temporary misconduct that has not been shown to have been prejudicial. In addition, this statement was also expressly contradicted by Juror No. 9's

statement to the court during its inquiry that she was actually deliberating with the other jurors and implicitly contradicted by the jury's notes to the court and other jurors' responses during the court's inquiry, which revealed that other jurors were frustrated with the views Juror No. 9 expressed during deliberations. Notably, no other juror, including Juror No. 10, stated that the jury deliberated without Juror No. 9.

With respect to Juror No. 9's statement regarding statements by Juror No. 11 at the outset of and during "the very early part of jury deliberation[s]," defendants have shown neither misconduct (*People v. Bradford* (1997) 15 Cal.4th 1229, 1351–1352 [emphatic expression of opinion by several jurors early in deliberations not misconduct]) nor prejudice. Nothing in counsel's declaration indicated that Juror No. 11 was biased or had arrived at the opinion he colorfully expressed upon any basis other than the evidence and law. Nor did the declaration indicate that Juror No. 11 refused to discuss the case or consider other jurors' points of view. Juror No. 11's conduct was far less egregious than that of the juror in *Leonard*, *supra*, 40 Cal.4th at pages 1410–1412, who, after expressing a "fixed conclusion at the beginning of deliberations," separated himself from his fellow jurors and refused to deliberate. Accordingly, absent any showing that Juror No. 11's view of the case resulted from bias or prejudging the case, it was necessarily harmless misconduct.

The "pressure," "belittling," "bullying," and rude statements to Jurors No. 9 and 10 described in counsel's declaration constitute only lamentably bad behavior, not juror misconduct. Heated disagreements between jurors, expressions of frustration at the pace of deliberations or with other jurors, and rude persuasion tactics are inherent in human group dynamics, and do not constitute misconduct or permit an inquiry into the validity of a verdict. (*People v. Cox* (1991) 53 Cal.3d 618, 693–695 [not misconduct where jurors violated nonsmoking order, bothering nonsmoking jurors], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Keenan* (1988) 46 Cal.3d 478, 540–541 [not misconduct where majority juror threatened to kill holdout

31

juror]; *People v. Orchard* (1971) 17 Cal.App.3d 568, 572–574 [not misconduct where foreperson angrily chastised minority juror for 10 to 15 minutes].)

Accordingly, defendants failed to make a prima facie showing sufficient to support a reasonable belief that jury misconduct occurred, and the trial court properly denied the petition to disclose juror information. Perez's related claim that the trial court erred by failing to hold a posttrial misconduct hearing fails for the same reason.

## DISPOSITION

The judgment against Perez is affirmed. The judgment against Escobar is reversed and the matter is remanded for a new trial.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


CHANEY, J.


32